# THE SUPREME COURT

OF

# PENNSYLVANIA.

33    9
154  629

## EASTERN DISTRICT—PHILADELPHIA 1859.

## Soohan *versus* The City of Philadelphia *et al.*

Stephen Girard devised certain portions of his estate to the city of Philadelphia, in trust to found a college for white male orphans; and provided that a preference should be given, first, to orphans born in the city of Philadelphia: *Held*, that a fatherless child was an orphan, within the meaning of the will; and that a preference was to be given to orphans born within the original corporate limits of Philadelphia, as laid out by William Penn, and existing at the death of the testator.

APPEAL IN EQUITY from the Court of *Nisi Prius.*

This was a bill in equity by James Soohan, a minor and orphan, by his mother and next friend, against the City of Philadelphia and the Directors of the Girard College for Orphans, for an injunction to restrain the defendants from admitting into the Girard College for Orphans, certain other persons, in preference to the complainant, who claimed a prior right under the will of the founder.

The bill set forth that Stephen Girard, by his will, dated the 16th February 1830, gave and bequeathed unto the Mayor, Aldermen and Citizens of Philadelphia, certain portions of his estate, in trust to found a college for the maintenance and education of poor white male orphans, between the ages of six and ten years. And that he therein made the following provisions relative to the admission of orphans into the said college:—

"4. On the application for admission, an accurate statement

(9)

[Soohan *v.* The City of Philadelphia *et al.*]

should be taken in a book, prepared for the purpose, of the name, birth-place, age, health, condition as to relatives, and other particulars useful to be known, of each orphan.

"5. No orphan should be admitted until the guardians or directors of the poor, or a proper guardian or other competent authority, shall have given, by indenture, relinquishment, or otherwise, adequate power to the mayor, aldermen and citizens of Philadelphia, or to directors, or others by them appointed, to enforce, in relation to each orphan, every proper restraint, and to *prevent relatives* or others from interfering with, or withdrawing such orphan from the institution.

"6. Those orphans, for whose admission application shall first be made, shall be first introduced, all other things concurring— and at all future times, priority of application shall entitle the applicant to preference in admission, *all other things concurring ;* but if there shall be, at any time, more applicants than vacancies, and the applying orphans shall have been born in different places, a preference shall be given—*first,* to orphans born in the city of Philadelphia ; *secondly,* to those born in any other part of Pennsylvania ; *thirdly,* to those born in the city of New York (that being the first port on the continent of North America at which I arrived) ; and *lastly,* to those born in the city of New Orleans, (being the first port on the said continent at which I first traded, in the first instance, as first officer, and subsequently, as master and part owner of a vessel and cargo.")

That the Mayor, Aldermen and Citizens of Philadelphia accepted the trusts contained in the will, and erected and furnished the college buildings. That by an Act of Assembly of the 27th February 1847, the guardians of the poor were authorized, with the consent of the surviving mother, guardian, next friend, or by their own authority, if there were no such mother, guardian, or next friend, of any poor white male orphan child within the said Commonwealth, between the age of six and ten years, for whose admission to the said college application should have been made, to bind such orphan child, by indenture, to the mayor, aldermen and citizens of Philadelphia, as trustees under the said will, as an orphan to be admitted into said college, to be there maintained and educated according to the provisions, and in the manner, and under all the regulations and restraints, directed or contained in the said will, or as the said trustees might lawfully ordain.

That the said corporation by the select and common councils thereof, by an ordinance or law passed 27th May 1847, provided for the appointment, from time to time, of a board of directors, and authorized the said board to superintend the organization and management of the said college, in conformity with the said will, and with such ordinances as the said councils should, from time to time, lawfully enact in relation thereto.

That the said board of directors, so constituted and appointed, undertook the superintendence of the organization and management of the said college, and still continued such superintendence; and in execution thereof, they had admitted, and still, from time to time, admitted orphan children into the said college, for the purposes set forth in the said will.

That at the time of making and of the probate of said will, and the said acceptance of the said trust, the territorial boundaries of the said corporation of the Mayor, Aldermen and Citizens of Philadelphia, were Vine and South streets, and the rivers Delaware and Schuylkill.

And the complainant expressly charged, that orphans born within the said limits were entitled to admission into the said college, before those born in other places; and that one of the trusts declared by said will, and upon which the said corporation accepted the said bequest, was, that they should not admit into the said college, any orphan born outside of the said limits, while any orphan, born within said limits, was an applicant for admission therein, provided such orphan, in other respects, fell within the requisitions contained in said will.

That by an Act of the 4th February 1854, the corporate name of the Mayor, Aldermen, and Citizens of Philadelphia, was changed to that of "The City of Philadelphia," and the boundaries of the said city were extended so as to embrace the whole of the county of Philadelphia; and in the said act it was provided, that all the powers of the said corporation, as enlarged and modified thereby, should be exercised and have effect within the said county, and over the inhabitants thereof. And it was further provided by the said act, that all the estates and incomes, then held in trust by any of the corporations, which, by the said act, were merged into the corporation thereby created, should be held by the said corporation, "upon and for the same uses, trusts, limitations, charities, and conditions, as the same are now held by the said corporations respectively." And that the said corporation of the City of Philadelphia held the said trust for the said college, upon the same trusts and limitations, as the same was held by the said corporation of the Mayor, Aldermen and Citizens of Philadelphia.

That the complainant was born on the 1st April 1850, in Water street, between Arch and Race streets, in the said city. That his father died on the 29th January 1853, without property, and leaving his family in destitute circumstances; and that since the death of his father, he had been supported by his mother, from the fruits of her own labour.

That on 13th July 1857, his mother made application to the said directors, or the proper committee, for his admission into the said college; and that his mother was prepared, and has ever since been prepared to do and perform all things necessary to

[Soohan *v.* The City of Philadelphia *et al.*]

enable the said directors to enforce, in relation to him, every proper restraint, and to consent to the binding of him to the said the Mayor, Aldermen and Citizens of Philadelphia, as trustees under the said will, as an orphan, to be admitted into the said college.

That the said directors had refused to admit, and had resolved and intended to admit therein, to his exclusion, certain orphans, thereinafter named, some of whom applied for admission into the said college, subsequent to his application; and the balance were not born in the said city of Philadelphia, between Vine and South streets, and the rivers Delaware and Schuylkill.

That the complainant had remonstrated with the defendants, and represented that he was entitled to be admitted into the said college before the admission of the above-named orphans, but the defendants insisted that, because the before-named orphans had lost both father and mother, they were entitled to admission into the said college before, and to the exclusion of the complainant, notwithstanding the fact, that all thereof applied for such admission after he had applied, or were born out of the aforesaid city of Philadelphia; because the complainant had lost but his father, and because his mother was still alive; and they said that the said will and trusts required that they should admit no one into the said college, except those who had lost both parents; and, that none other than such were orphans.

But the complainant insisted and prayed the court to decide that poor white male children, between the ages of six and ten, who are fatherless, are orphans, and are entitled to admission into the said college, if they are, in other respects, qualified; and that such, aforesaid, as have first made application, are first entitled to admission.

And that the defendants might be restrained by injunction from admitting into the said college, the other orphans therein named, to the exclusion of the complainant; and from further refusing to admit the complainant therein.

The answer admitted the truth of the facts set forth in the complainant's bill; and the cause having been heard, on bill and answer, the court below made the following decree in favour of the complainant:—

And now, to wit, January 15th 1859, the cause having come on to be heard on bill and answer, it is ordered, adjudged, and decreed by the court, that under the provisions of the will of the said Stephen Girard, and for the purposes thereof, a fatherless child shall be held to be an orphan; and that such orphans as were born within the limits of the city of Philadelphia, as the same existed at the time of the making of the said will and the probate thereof, that is to say, between Vine and South streets, and between the rivers Delaware and Schuylkill, are entitled, pro-

[Soohan v. The City of Philadelphia et al.]

vided they are, in other respects, qualified, to admission into the said college before such orphans as were born elsewhere. And that the City of Philadelphia, and Samuel H. Perkins, William Biddle, James J. Boswell, George C. Bower, Jr., Alexander Brown, James Campbell, Mordecai L. Dawson, Daniel Deal, William H. Drayton, Samuel F. Flood, Daniel M. Fox, Thomas E. Harkins, William Martin, George W. Nebinger, Robert Selfridge, Thomas S. Stewart, James S. Watson, and William Welsh, directors of the Girard College for orphans, their officers and agents, be, and they are hereby perpetually enjoined from admitting into the Girard College for orphans, Robert Smith, Samuel Brown, W. James Young, Harry Whitely, George E. Naylor, John B. Dinsmore, John Wark, John B. Porter, James W. Kerr, William Stott, Morris Zooks, Charles D. Pidgeon, George Wirth, Somers L. Steelman, William Pendleton, John L. Spear, Charles Riter, David R. Twining, George M. Hackett, George Cusack, and James W. Quereau, until James Soohan, the complainant, is admitted; and that the said defendants be enjoined from further refusing to admit the said James Soohan therein.

From this decree, the present appeal was taken by the defendants.

*King*, for the appellants.—The word "orphan," though so well known to statute and decision, seems never to have received a judicial definition in this country or in England. The present rules of the Girard College admit as orphans, within the meaning of Mr. Girard's will, none but children who have lost both parents. Are these rules consonant to the intent of the testator; and if so, are those rules repugnant to any principle of law? In the absence of judicial decisions, we must resort to law dictionaries, compiled by men of acknowledged learning and research, as furnishing the best authority attainable. *Bouvier* (2 *vol. Dict.* 225) defines " the word orphan," " a minor or infant, who has lost both of his or her parents—sometimes the term is applied to such a person who has lost only one of his or her parents."

In literary dictionaries, *Webster* is, perhaps, the best guide; and he makes a distinction between the word when used as a substantive and as an adjective—the former is defined " a child who is bereaved of both parents ;" the latter is said to mean " bereaved of parents."

An orphan, says the complainant, is a *fatherless* child; such a definition is not supported by reason or authority. The custom of London, which is relied upon as supporting this construction, shows that the practical meaning held by the Orphans' Court of that city, was, that an orphan, within the jurisdiction of that court, was a child who had lost either parent. For, if any man or *woman*, free of the city of London, died, leaving children within

[Soohan *v.* The City of Philadelphia *et al.*]

age, a court of record, composed of the mayor and aldermen of the city, had the custody of the persons, lands, and chattels of such orphans : *Wood's Inst.* 532 ; *Macpherson on Infants* 48. This custom proves too much for the appellee, as it widens this charity greater than the most liberal constructionists have yet done—so wide as to reach children whose fathers are living. For, if it is held that an orphan is any other than a child bereaved of both parents, there is no place to pause until it is decided that the loss of either makes an orphan.

The counsel then argued, that from the reading of Stephen Girard's will, it was evident that, by the word " orphan," he meant a child bereaved of both parents.

*Olmsted*, for the appellee.—1. In the admission of orphans to the Girard College, preference is to be given to those born within the corporate limits of the city of Philadelphia, as existing at the death of the testator : *Girard's Will*, §§ 20, 22 ; Blenon's Estate, *Brightly* 338 ; Plymouth Township *v.* Jackson Township, 3 *Harris* 44 ; Commonwealth *v.* Erie and North-East Railroad Co., 3 *Casey* 339.

2. For the purpose of admission into the Girard College for Orphans, a fatherless child is an orphan.

The appellant has argued that Mr. Girard's definition of an orphan may be collected from his will. This is first attempted to be shown by the argument, that when he first describes the objects of his legacy, he calls them " orphan children." And that the adjective " orphan" has a different signification than the noun " orphan ;" the former being defined by lexicographers to be " a parentless child."

In answer to this argument, and all arguments which rest on verbal criticisms, the reply is to be found in the opinion of the court, in the case of Beck *v.* City, 5 *Harris* 112. That case arose under the will of Mr. Girard, and involved the construction of a portion of it ; and in answer to an argument, similar to the one under consideration, Judge LEWIS observes, that verbal criticisms " are certainly not entitled to controlling influence in the construction of instruments supposed to be frequently prepared in the hour of extremity, without the assistance of professional advice."

The Act of 1847 did certainly define an orphan, for admission into the college, to be a fatherless child. And this act, in the language of LEWIS, J., in the case before mentioned, when speaking of an Act of the Legislature, having reference to this will, " may be regarded as the enlightened judgment of a co-ordinate branch of the government, in the exercise of its legislative functions of legislation."

It is believed that no case can be found, where it is decided that

[Soohan *v.* The City of Philadelphia *et al.*]

an orphan is a fatherless child; nor has any case decided that an orphan is a child who has lost both parents. But there are several cases, where it is taken for granted, and mentioned without question, that a child, who has lost its father, is an orphan, while its mother is still living: 2 *Salk.* 426; 2 *Bl. Com.* 519; 4 *Burns' Ecc. L.* 443, 444; 7 *Vin. Abr.* 213; 1 *Macpherson on Infants* 54; *Tomlin's L. D.*, tit. *Orphan; Wharton's L. Lexicon*, tit. *Orphan.*

In Pennsylvania, by the Act of 1713, a fatherless child is recognised as an orphan: 1 *Smith's Laws* 81.

The understanding of a people, as to the meaning of a word or phrase, can only be ascertained by reference to written works habitually in use among them. With this view, the following are presented:—Book of Lamentations, ch. v., verse 3: *We are orphans and fatherless, and our mothers are as widows.* In the translation of the Septuagint version, by Charles Thompson, published in Philadelphia, in 1808, the verse is rendered: *We are become orphans, our father is no more; our mothers are like widows.* In the Psalter, in the Book of Common Prayer of the Church of England, Psalm 68, v. 5, reads: "*He is a father of the fatherless, and defendeth the cause of the widows; even God in his holy habitation.*" Psalm 82, v. 3, reads: "*Defend the poor and fatherless; see that such as are in need and necessity have right.*" Psalm 109, v. 8: "*Let his children be fatherless: and his wife a widow.*" Verse 11: "*Let there be no man to pity him: nor to have compassion upon his fatherless children.*" In the English Bible, Psalm 10, v. 18: "*To judge the fatherless and the oppressed, that the man of the earth may no more oppress.*" Psalm 140, v. 9: "*The Lord preserveth the strangers: he relieveth the fatherless and widow: but the way of the wicked he turneth upside down.*"

Whenever the translators of the Bible, and the compilers of the English Book of Common Prayer, intended to present the idea of destitution, friendlessness, helplessness, or abandonment, they described the object as fatherless. The following are examples:—

Epistle of St. James, 1, v. 27: *Pure religion, and undefiled before God and the Father, is this, to visit the fatherless and widows in their affliction,* &c.

Psalm 10, v. 20: *To help the fatherless and poor unto their right, that the man of the earth be no more exalted against them.*

Litany in Book Common Prayer: *That it may please thee to defend and provide for the fatherless children and widows, and all that are desolate and oppressed.*

Commination Service, same book: *Cursed is he that perverteth the judgment of the stranger, the fatherless and widow.*

These expressions show that fatherless was considered as equivalent to friendless, destitute, and helpless; and therefore, the

[Soohan *v.* The City of Philadelphia *et al.*]

word orphan, which originally meant bereaved, or needy, came to be used as its synonym.

Henry V., Act 2, Scene 4:—

> And on your head
> Turning the widow's tears, the *orphan's* cries,
> The dead men's blood, the pining maiden's groans
> For husbands, *fathers*, and betrothed lovers, &c.

Richard III., Act 2, Scene 2:—

> Why do you look on us, and shake your head,
> And call us *orphans*, wretches, castaways?
> If that our noble father were alive.

Same, Act 2, Scene 2:—

> *Children*—Were never *orphans* had so dear a loss.
> *Dutchess*—These babes for Clarence weep, and
> So do I.

In a ballad published in England shortly after the battle of the Nile, the following verses occur:— ·

> Yes! I was once a father's pride,
> And my poor mother's hope and joy,
> But in the Nile's proud fight he died,
> And left me a poor *orphan* boy.

> She called me her poor orphan boy, &c., &c.

Francisci Junii Etymologicum Anglicanum—Orphan. Orphanus, " *orbus patri.*" And this is the only meaning given.

Constitution and Plan of Education for the Girard College for Orphans, by Francis Leiber, published by the trustees of the college, in 1834, at page 130, is a note, from which the following is extracted:—

"The French Dictionary of the Academy says, *Orphelin : enfant mineur qui a perdu son père et sa mère, ou l'un des deux ;* but it adds, *il est a remarquer que dans l'usage ordinaire, ou ne se sert guère du mot d'orphelin en parlant d'un enfant qui n'a perdu que sa mère.* The Spanish and Portugese Dictionaries of the respective Academies, were considerably influenced by the French. Thus we find in the first, *Huerfano : persona de menor edad á quien han faltado su padre y madre ó alguno de los dos—* a literal translation of the French. Of *Orfandad*, however, the same work gives this definition : *Falta de los padres :* y tambien *se toma por la falta del padre solo.* The Portuguese *orfao* signifies, in general and law language, always, a fatherless or parentless child. *Orfanologia* is a work on laws of orphans, *i. e.* fatherless children ; because there are no special laws respecting children bereft of their mothers only. In Swedish, there is no single

word to express a fatherless, motherless, or parentless child; the Swedes say, *fader eller moder lost barn* (fatherless or motherless child); but an orphan asylum is *barnhus for faderlosa barn*, (a children's house for fatherless children.)—*Seuniu's Swedish Dictionary.*

"In Danish, the word for orphan is *faderlös* (fatherless); *modelös* is translated by motherless, but *faderlös* by orphan.—*Wolff's Dan. and Engl. Dictionary.* To repeat, the Greek and Latin words are entirely indistinct; the Italian and Spanish are for including the loss of both parents, or either of them; the French inclines for excluding the loss of the mother; the German, Swedish, Danish, and Portuguese, do still more so."

26 *Rees's Cyclo.*, title Orphan—a child, a minor destitute of a father. Hence, the Taborites, or followers of Zisca, finding themselves, at his death, without a chief or conductor, took the appellation of orphans. *Bailey's Dict.* folio, 1736: Orphan—one bereaved of father or mother. *Johnson's Dict.* folio, 1765: Orphan—a child who has lost father or mother, or both. *Hyde Clark's Dictionary*, London, 1858: Orphan—a child bereft of father or mother, or both.

The opinion of the court was delivered by

READ, J.—William Penn contemplated, before leaving England for America, laying out a certain quantity of land or ground plat, for a large town or city, in the most convenient place upon the river for health and navigation. In his celebrated letter to the committee of the Free Society of Traders of the Province, residing in London, written in 1683, he describes his city in the following language: "Philadelphia, the expectation of those that are concerned in this province, is at last laid out, to the great content of those here, that are anyways interested therein. The situation is a neck of land, and lieth between two navigable rivers, Delaware and Schulkill, whereby it hath two fronts on the water, each a mile, and two from river to river. Delaware is a glorious river; but Schulkill, being a hundred miles boatable above the falls, and its course north-east, towards the fountain of Susquehanna, that leads to the heart of the province, and both sides our own, it is like to be a great part of the settlement of this age. I say little of the town itself, because a platform will be shown you, by my agent, in which those who are purchasers of me, will find their names and interests."

In a short advertisement, upon the situation and extent of the city of Philadelphia, and the platform thereof, by the surveyor-general, Thomas Holme, he says: "The city of Philadelphia now extends from river to river, two miles, and in breadth, near a mile; and the governor, as a further manifestation of his kindness unto the purchasers, hath freely given them their respective lots, in the

[Soohan *v.* The City of Philadelphia *et al.*]

city, without defalcation of any of their quantities of purchased lands; and as it is now placed and modelled between two rivers, upon a neck of land, and that ships may ride in good anchorage in six or eight fathoms water, in both, close to the city, and the land of the city, level, dry, and wholesome—such a situation is scarce to be paralleled."

Throughout the whole of this document, it is spoken of as the city; and in mentioning the public squares, uses this language: " There are also in each quarter of the city, a square of eight acres, to be for the like uses as the Moorfields are in London."

· " The air," says the Proprietary, " is sweet and clear; the heavens serene—like the south parts of France, rarely overcast; and as the woods come, by numbers of people, to be more cleared, that itself will refine."

In the same year, 1683, that the city was laid out by the proprietary, it is called, in the heading to the laws made at an assembly, held at Philadelphia, the 27th day of the eighth month, " The city of Philadelphia;" and in various acts, up to the year 1701 inclusive, " The town of Philadelphia:" 1 *Hall & Sellers,* p. 19.

On the 25th October 1701, the proprietary granted a charter to the city of Philadelphia, in which he said, " that at the humble request of the inhabitants and settlers of this town of Philadelphia, being some of the first adventurers and purchasers, within this province, for their encouragement, and for the more immediate and entire government of the said town, and better regulation of trade therein, I have, by virtue of the king's letter patent, under the great seal of England, erected the said town into a borough, and by these presents, do erect the said town and borough of Philadelphia, into a city, which said city shall extend the limits and bounds, as it is laid out between Delaware and Schuylkill." And its corporate title was the " Mayor and Commonalty of the City of Philadelphia."

By the revolution, according to the expressive language of the legislature of 1777, all powers and jurisdictions, not founded on the authority of the people only, became null and void; and the corporation of the city was, therefore, dissolved, and all its powers and jurisdictions entirely ceased.

The affairs of the city were managed by various local bodies, until the passage of the act to incorporate the city of Philadelphia, on the 11th March 1789, by which " the inhabitants of the city of Philadelphia, *as the same extends and is laid out* between the rivers Delaware and Schuylkill, be, and they and their successors for ever, are hereby constituted a corporation and body politic in fact and in law, by the name and style of " The Mayor, Aldermen and Citizens of Philadelphia; ' " and so continued, until their

[Soohan v. The City of Philadelphia *et al*.]

consolidation with the rest of the county of Philadelphia into one great city, under the Act of the 2d February 1854.

On the 18th April 1794, the district of Southwark was incorporated by the name of "The Commissioners and Inhabitants of the District of Southwark;" on the 28th March 1803, the district of the Northern Liberties was incorporated; on the 12th March 1812, the township of Moyamensing; on the 22d March 1813, the district of Spring Garden; and on the 6th of March 1820, the Kensington district was incorporated.

The city of Philadelphia, in 1744, contained 1500 houses, and 13,000 people; in 1790, 28,552; in 1800, 41,220; in 1810, 53,722; in 1820, 63,802 inhabitants; whilst the rest of the county of Philadelphia, from 1800 to 1820, numbered about as many as the city proper. In 1830, the population of the city was 80,458; of the surrounding incorporated districts above enumerated, 80,952; and of the rural districts of the county, 27,451.

The city of London, like the city of Philadelphia, is surrounded by other municipal communities, entirely distinct from it, as to revenue, expenditures, and local administration; and whilst the whole metropolis, in 1841, covered a surface of 10,000 acres, with a population of nearly 2,000,000, its territory is limited to about one square mile, or 600 acres, and its population to 129,251 souls. The corporate and parochial income of the city of London, for public objects, and derived from trust estates for the relief of the poor, care of the sick, education, religion, and general purposes, local rates, coal and metage duties, street and market tolls, freedom and livery fines, and other charges for corporate and trading privileges, the port of London, and the conservancy of the river, is estimated to amount to the annual sum of £900,000 sterling, or $4,500,000.

Stephen Girard was born in Bordeaux, in France, on the 21st day of May 1750. His father was a sea captain, and at the age of fourteen, young Girard became a sailor, and made several voyages to the West Indies. On the 4th October 1773, after undergoing the necessary examination, a license was duly granted, giving to Stephen Girard, of Bordeaux, full authority to act as captain, master, and patron of a merchant vessel.

Having purchased goods to the value of nearly 16,000 livres, or about $3000, in federal money, Mr. Girard started on his first mercantile adventure, and sailed again from his home (which he never afterwards revisited), arriving at St. Marc's, in the island of St. Domingo, in the month of February 1774. After disposing of his venture, and converting the proceeds into produce, he left the West Indies, and arrived, for the first time, in the North American colonies, at the port of New York, in the month of July, of the same year. For several years, first as mate, and subsequently as master and part owner of a small vessel and cargo,

he traded between New York, New Orleans, and Port au Prince; and in May 1777, in the latter capacity, Mr. Girard entered the waters of the Delaware, and arrived, for the first time, at Philadelphia, where he commenced business, and rented a store in Water street, within a short distance of the spot where he located himself permanently.

On the approach of the British troops, he left for Mount Holly, in New Jersey, where he purchased a small property; and after the evacuation of Philadelphia by the enemy, on the 17th of June 1778, he again returned, and resumed his business in Water street.

In this neighbourhood, with the exception of a voyage to Charleston and the Mediterranean, in a brig owned and commanded by himself, and which terminated in July 1788, Stephen Girard lived and died a citizen of the city of Philadelphia.

In the great yellow fever of 1793, which broke out in Water street, within a square of his residence, Mr. Girard distinguished himself by visiting and attending upon the sick, and by his invaluable services as an active manager of the hospital at Bush Hill.

Seventeen thousand persons left the city, and of the remainder, upwards of four thousand, or nearly a fifth, died. At a meeting of the citizens of Philadelphia, the Northern Liberties, and district of Southwark, assembled on Saturday, the 22d day of March 1794, and presided over by Thomas McKean, a signer of the Declaration of Independence, and then chief justice, and afterwards governor of the state, their most cordial, grateful, and fraternal thanks were presented to their fellow-citizens named in the proceedings, "for their benevolent and patriotic exertions in relieving the miseries of suffering humanity on the late occasion." One of these citizens, thus gratefully remembered, was Stephen Girard, under whose "meritorious exertions and peculiar care," at the Bush Hill hospital, in conjunction with Peter Helm, "every possible comfort was provided for the sick, and decent burial for those whom their efforts could not preserve from the ravages of the prevailing distemper."

In 1797 and 1798, the fever again prevailed in Philadelphia with fearful violence, and again Mr. Girard exhibited the same enlarged philanthropy, and the same disregard of danger, by liberal contributions, and personal services to the sick and dying.

In 1802, Mr. Girard was elected a member of the city councils, and so continued for several years. Upon the expiration of the charter of the first Bank of the United States, he established his own private bank, in the building occupied by the late national institution, and his first cashier was Mr. George Simpson, the cashier of the late bank.

During the war, he rendered essential services by his loans and

subscriptions, and after its close, became a large stockholder in the second Bank of the United States.

For a period of upwards of forty years, although engaged in a most extensive commerce, and the owner of numerous vessels employed in a very large foreign trade, and in the latter part of it, the head of the greatest private bank in the Union, his life was spent in his counting-house in Water street, or in his banking-room in Third street, varied by almost daily visits to his modest farm in Passyunk. With a reputation extending over the United States and Europe, as a wealthy and successful merchant and banker, his habits were so retired, plain, and frugal, that his person was unknown to many of his fellow-citizens. His fame and his name are indissolubly connected with the great charity which creates the subject of this dispute—his orphan college.

Stephen Girard died on the 26th December 1831, and his will was dated the 16th February 1830, and was republished by two accompanying codicils, dated the 25th December 1830, and 20th June 1831.

His will commences, "I, Stephen Girard, of the city of Phila-delphia, in the Commonwealth of Pennsylvania, mariner and merchant, being of sound mind, memory and understanding, do make and publish this my last will· and testament in manner following, that is to say;" and after various devises and bequests, he proceeds in the twentieth clause of his will, as follows:

"And whereas, I have for a long time been impressed with the importance of educating the poor, and by placing them by early cultivation of their minds, and the development of their moral principles, above the many temptations to which through poverty and ignorance they are exposed: and I am particularly desirous to provide for such a number of poor white male orphan children, as can be trained in one institution, a better education, as well as a more comfortable maintenance than they usually receive from the application of the public funds. And whereas, together with the objects just adverted to, I have sincerely at heart *the welfare of the city of Philadelphia*—and as a part of it am desirous to improve the neighbourhood of the river Delaware, so that the health of the citizens may be promoted and preserved, and that the eastern part of *the city* may be made to correspond better with the interior. Now I do give, devise, and bequeath *all the residue and remainder of my real and personal estate*, of every sort and kind wheresoever situate (the real estate in Pennsylvania charged as aforesaid) unto" the Mayor, Aldermen and Citizens of Philadelphia, in trust, and amongst others, to keep that part of the real estate situate in the city and liberties of Philadelphia, constantly in good repair.

The 21st clause provides, "and so far as regards the residue of

my personal estate, in trust as to *two millions of dollars*, part thereof, to apply and expend so much of that sum as may be necessary, in erecting, as soon as practicably may be, *in the centre of my square of ground between High and Chestnut streets and Eleventh and Twelfth streets in the city of Philadelphia* (which square of ground I hereby devote for the purposes hereinafter stated, and for no other, for ever), a permanent college with suitable outbuildings, sufficiently spacious for the residence and accommodation of at least three hundred scholars, and the requisite teachers, and other persons necessary in such an institution as I direct to be established, and in supplying the said college and outbuildings, with decent and suitable furniture, as well as books, and all things needful to carry into effect my design.''

Then followed minute and accurate directions for the erection of his college: "and when the college and appurtenances shall have been constructed, and supplied with plain and suitable furniture and books, philosophical and experimental instruments and apparatus, and all other matters needful to carry,'' as he says, "my design into execution, the income, issues, and profits of so much of the said two millions of dollars as shall remain unexpended shall be applied to maintain the college according to my directions.''

Then follow ten paragraphs in which he directs how his college shall be organized and managed, and what orphans shall be admitted into it. They must be *poor white male orphans* between the age of six and ten years, and must be bound to the corporation of the city. Priority of application to entitle to preference, all other things concurring; if more applicants than vacancies preference shall be given, "*First*, to orphans born in the city of Philadelphia; *Secondly*, to those born in any other part of Pennsylvania; *Thirdly*, to those born in the city of New York (that being the first port on the continent of North America at which I arrived); and lastly, to those born in the city of New Orleans, (being the first port on the said continent at which I first traded in the first instance, as first officer, and subsequently as master and part owner of a vessel and cargo).''

If the income arising from the residue of the two millions, remaining after the construction and furnishing of the college and outbuildings, shall be inadequate to the construction of new buildings, or the maintenance and education of as many orphans as may apply for admission, then such sum as may be necessary for those purposes shall be taken from the final residuary fund—" my design and desire being,'' says the testator, "that the benefits of said institution shall be extended to as great a number of orphans as the limits of the said square and buildings thereon can accommodate.''

By the 22d clause there is a trust created in the city, as to a

[Soohan *v.* The City of Philadelphia *et al.*]

further sum of *five hundred thousand dollars,* the income of which
is to be exclusively applied :

1. To lay out, regulate, curb, light, and pave a passage or street
on the east part of the city of Philadelphia, fronting the river
Delaware, and to be called Delaware Avenue, extending *from Vine
to Cedar streets;* and amongst other things, to completely clean
and keep clean all the docks within the limits of the city fronting
on the Delaware.

2. To remove and prohibit all wooden buildings within the limits
of the city.

3. To widen Water street, east and west, from Vine street all
the way to South street, and to distribute the Schuylkill water
therein. ·

By the 24th clause of his will, the remainder of the residue of
his personal estate is to be invested by his said trustee, the corpo-
ration of the city, and with its accumulations to form a permanent
fund, the income of which is to be applied :

1. To the further improvement and maintenance of the college.

2. To establish a competent police for the security of the
persons and property of the inhabitants of the city.

3. To improve the city property, *and the general appearance
of the city itself*, and to the reduction of taxes.

" To all which objects," says the testator, "the prosperity of the
city, and the health and comfort of its inhabitants, I devote the
said fund aforesaid, and direct the income thereof to be applied
yearly, and every year for ever, after providing for the college as
hereinbefore directed, as my primary object."

By his last codicil, Mr. Girard changed the location of his college
from the lot on Chesnut street to the farm called Peel Hall, on the
Ridge Road, in Penn township.

By the Acts of the 24th March and 4th April 1832, the Mayor,
Aldermen and Citizens of Philadelphia were enabled to carry into
effect the improvements, and to execute certain trusts contained
in the will.

The corner stone of the college was laid on the 4th July 1833,
and the building was finished, and the institution organized and
opened on the 1st January 1848—fourteen years and a half after-
wards ; and nearly two millions of dollars were expended in its
erection. By actual expenditure, and by depreciation of the
stocks, in which the great charity fund of two millions was invested,
every dollar of this most munificent appropriation, for the benefit
of the poor white male orphans, the objects of Stephen Girard's
bounty, has entirely disappeared, and the college is now supported
by the income of the residuary real and personal estate which
was originally devoted to other objects.

If the simple plan of Stephen Girard had been strictly followed,
and if, as advised at the time, the whole of the personal property

had been gradually laid out in safe mortgages in the city and county of Philadelphia, a very large portion of the two millions would have been still remaining to maintain and increase the Girard College for Orphans, and at the same time, have improved the whole district by affording an additional sum to be laid out in the improvement of real estate.

The college was erected under the charge of a building committee of the select and common councils, whilst a board of trustees regulated the other affairs of the institution, until it was abolished by ordinance on the 23d of December 1841, together with the offices of secretary to the said board, and of president of the Girard College for Orphans. By the tenth section of the ordinance of the 21st March 1833, it was made the duty of the said trustees to prepare as soon as practicable, and submit to councils for their approbation, the plan of a system of government and instruction for the said college, "having reference to the will of Stephen Girard, so far as they are express on this subject."

Dr. Francis Lieber having been charged by the trustees to draw up this plan, on the 5th December 1833, submitted it to them, with an introductory report, which were both printed by order of the board.

In this report, the question of what was the meaning of the word *orphan*, in Mr. Girard's will, was fully and learnedly discussed; and it was settled by Dr. Lieber, after a most extensive and elaborate examination, to mean a fatherless child.

"When Mr. Girard," says he, "uses the word orphan, we are sure he did not look for the etymology of the word, but used it in that sense which presented itself as the readiest in his mind— which sense was this? Mr. Girard, a native Frenchman, spoke much French, and better than English, throughout his whole life. It is possible, therefore, that though his will is drawn up in English, the word orphan presented itself to his mind with that meaning which *orphelin* has in French, because if two languages are equally ready to a mind, as means of thought and utterance, which is much more than the capacity of speaking two languages, phenomena take place in the human mind, which can be known by personal experience only. Sometimes we think in one language, sometimes in another : sometimes we use one language, and yet transplant to certain words the meaning which belongs to their fellow words in the other language. We must then take the word orphan in its English or French sense, if we wish to ascertain its precise meaning, as to the will in question, *and in both languages, the word orphan, in common language, means a fatherless child*, as the following note and the succeeding lines will show; it never means anything different, if used to designate asylums, or any institutions for them. Whatever may be the poet's use of the word

[Soohan *v.* The City of Philadelphia *et al.*]

*orphan,* as soon as it assumes in any degree a legal or official sense, it signifies, and very naturally so, fatherless children only."

After discussing briefly the question, whether the word orphan in the will of Mr. Girard includes children who have lost their mothers only, he says: "A learned judge of our city has shown, as you are well aware, that in those few cases, in which the English courts have been called upon to construe the word orphan, it has been taken in the sense of a fatherless child. In our country, as I have been informed by some of the first jurists" (Chancellor Kent and Judge Story), "it is believed that no such official decisions exist, but that the meaning attached to the word orphan, by the people at large, is unquestionably that of a fatherless child— a meaning which entirely agrees with our whole social system. I am fully aware of the paramount importance of the mother in the education of a child; this importance even increases the farther we descend in the scale of social relations. I have enlarged upon this point in another work. But our whole social system would be overturned, were we no longer to consider the father the chief of the house, the 'lord' of the family. In all civilized countries, the law justly takes cognisance of the death of a father; it appoints guardians, it administers the property of the minors, and watches over their interests; but in no country does the law take cognisance of the death of the mother only, except in some special cases, where her property has been kept separately. The respective relations of the father and the mother to the child, are founded in the necessity of things, and therefore established by Him who assigned different spheres of activity to everybody in the universe, —relations, and conditions, against which we can never act with impunity."

The third article of the constitution framed by Dr. Lieber says: "an orphan is a fatherless child."

This question had been discussed in the spring of 1833, in a friendly correspondence between ex-president John Quincy Adams and Judge Hopkinson; the first maintaining that the word orphan includes all those children who had lost both or either parent, the latter that it was to be confined to those who had lost their fathers only, in other words to fatherless children. (14 *Hazard's Register of Pennsylvania,* p. 188.)

Until 1847, annual appropriations were made out of the residuary estate, for the support of the police, the improvement of the city property, and the general appearance of the city, and in effect to diminish the burden of taxation, but they ceased of course with the completion of the college—the erection of which had entirely exhausted the special fund of two millions.

As the time approached for the organization and opening of the college, the legislature, on the 27th February 1847, passed an act relative to the Girard College for Orphans, by which the guardians

of the poor were authorized, with the consent of the *surviving mother*, guardian, or next friend of any poor white male orphan child, within this Commonwealth, between the age of six and ten years, for whose admission to the Girard College for Orphans, application shall have been made, to bind such orphan child by indenture, to the Mayor, Aldermen and Citizens of Philadelphia, as trustees under the will of Stephen Girard, deceased, as an orphan to be admitted into the said college; to be there maintained and educated, according to the provisions and in the manner, and under all the regulations and restraints, directed or contained in the said will. And the said corporation of the Mayor, Aldermen and Citizens of Philadelphia, was constituted the guardian of such orphan child.

On the 27th May 1847, councils passed an ordinance, to provide for the organization and management of the Girard College for Orphans, which provided for the election by councils of a board of sixteen directors, who were to elect a president and secretary, and to submit a plan for the government and instruction of the college, to give notice of its opening, and to present estimates annually, in the month of December, for the ensuing year.

By another ordinance, passed 16th September 1847, to provide for the opening of the Girard College for Orphans, the building committee were authorized to deliver possession of the college, as soon as completed, with the books, furniture, and apparatus, to the directors; who were to furnish the building, from the college fund, to give thirty days' notice of the intended opening, and who were to prepare and publish with the notice of the intended opening, *a form of application for the admission of orphans*, in which the regulations of the will of Stephen Girard, in regard to the birthplace, residence, and age of each applicant, his name, health, and condition as to relatives, and other particulars useful to be known, of each orphan, shall be carefully observed. The ordinance then designated the officers of the institution, who were to hold their offices during the pleasure of the directors.

To the form of application for admission into the college, framed and published by the directors, are attached several questions, among which are the following:—

2. When was he born?

3. Where was he born?

4. What was his father's name, and when and where did he die?

5. Is his mother living? and if she is, what is her name, and where does she reside?

10. Are there any pecuniary means at the disposal of his mother, or other persons, for his maintenance and education?

The building committee was dissolved, and the members of the select and common councils were constituted a standing committee of visitation of the Girard College for Orphans, and a recording

secretary was elected by the board of directors, who is removable at their pleasure, and whose duties are defined by the ordinances of the city.

The first president of the college, after its organization, was the Honourable Joel Jones, the second and present one, Professor William H. Allen, both men of high moral and intellectual worth, and admirably fitted, by temper and disposition, for the administration of this noble charity.

In every annual report of the directors of the college, previous to the present dispute, the original construction given to the will, recognising every fatherless child as an orphan, has been approved, and the whole institution has been conducted upon this principle. On January 1st 1851, Benjamin Gerhard, Esquire, in addressing "the board of directors and officers, and pupils of the college, with the councils of the city, and other city, county, and state officers, and numerous *parents* and friends of the children, and other citizens assembled in the chapel of the institution, said: 'Who are orphans?' This inquiry was answered by the counsel, consulted by the corporation, that such are orphans as have lost their fathers, and the opinion was at once acquiesced in."

On the 1st January 1850, the honourable Joseph R. Chandler, president of the board, in addressing an audience similarly composed, says: "Another objection was, that boys long separated from maternal association and care, would lose a part of that home love, that filial affection which lies so close to the foundation of all good feeling, all pure benevolence. We have been enabled to keep the control of the conduct of these children, to direct it and them in all ways; and yet to keep up their association with mother, sister, brother, friend, so that at no time has the chain of affection been weakened by neglect, or been allowed to rust for want of use. Home love has been cultivated, and *filial* piety improved."

On the same occasion, President Allen said, "The institution is no longer without precedents for guide, for it has established them for itself." After drawing a beautiful picture of one of its young inmates, expiring in the arms of his mother, he says, "I am here, under that Being who is the God and Father of us all, to be a father to the fatherless."

We thus see by a simple narrative of the origin and progress of this great charity, that in the commencement, the only difference of opinion was, whether the term orphan did not include a motherless as well as a fatherless child. Upon full discussion and a deliberate examination, and after an unreserved communication with the first jurists in the United States, the settled construction adopted and continued for a quarter of a century, was, that it included *fatherless* but *not motherless* children. This was published to the world and sanctioned by the legislature, and it has

[Soohan *v.* The City of Philadelphia *et al.*]

entered into the whole administration of the college, from its organization and opening, on the 1st January 1848, until the month of June 1858, a period of more than the tenth of a century, and under the immediate eye of *the grand committee of visitation*, the select and common councils of the city.

In the tenth annual report to the select and common councils of the city of Philadelphia, the directors say, " The condition of all orphans, now within the institution, shows that at the time of their admission fifty-four of them had neither father nor mother, and that the remaining two hundred and eighty-one had mothers. During the ten years elapsed, since the opening of the institution, one hundred and sixteen of the orphans received into it had neither father nor mother, and five hundred and forty-two had mothers. Of the applicants for admission during the same period, two hundred and seventy-three were without father or mother, and eleven hundred and ninety-six had mothers *only*."

This sacred trust was confided by Stephen Girard to the mayor, aldermen, and citizens of Philadelphia, who, by legislative enactment, have been succeeded by the City of Philadelphia, under and subject to the general provisions in the consolidation act. That all the estates and incomes, now held in trust by the county (present city) and each of the townships, districts, and other municipal corporations united by the act, shall be held by the City of Philadelphia, upon and for the same uses, trusts, limitations, charities, and conditions, as the same are now held by the said corporations respectively.

The directors of the Girard College are the creatures of an ordinance, and are merely the agents of the real trustee, the city, and yet, in June 1858, without (as far as it appears) taking the written opinion of any eminent professional man, or consulting the legislative authorities of the corporation, they make an entire change in the administration of this charity, and narrow its range of objects by excluding all children who are fatherless but not motherless, as recipients of Stephen Girard's bounty, by a new and restrictive meaning given to the word orphan. The effect of this new regulation is simply this, that the two hundred and eighty-one who were orphans on the 1st January 1858, are not orphans in June 1858, and of course should be expelled from the college; and that the five hundred and forty-two children, admitted as orphans since the opening of the institution, were never entitled to its benefits, and have been maintained and educated by the funds of this charity in direct violation of the will and of the clear intention of the testator. It was a decision that all former trustees and directors, all former councils, all the eminent jurists in this city and in the Union, including Chancellor Kent and Judge Story, had entirely mistaken the will of Mr. Girard, and that it was proper, immediately upon this discovery being made, to

change at once the whole course of administration, and to exclude, for ever, a very large class of orphans from all participation in the benevolence of the great benefactor of his adopted city.

In this state of affairs, it is perhaps proper to examine this question, to see if it is possible that so gross a mistake could have been committed by the very able, enlightened, and conscientious citizens who preceded the present direction of the college.

William Penn was born in the parish called St. Catherine's, near the Tower of London, and just outside of the walls of the city of London, on the 14th day of October (then the 8th month), A. D. 1644.

By the customs of the city, if a freeman of London died intestate, possessed of personal property more than sufficient to pay his debts and funeral expenses, his residuary estate was distributable in the following manner. After deducting for the widow her apparel and the furniture of her bedchamber (which in London is called the widow's chamber), the property was divided into three parts, one of which belonged to the widow, another to the children, and the third to the intestate's administrator. This custom was the remains of the old common law, and this portion which fell to the administrator, or, as it is termed, the *dead man's part*, or *death's part*, he formerly appropriated to his own use till the stat. 1 Jac. II. cap. 17, declared, that the same should be subject to the statute of distributions.

The share of a child is called the orphanage part or share, and the Lord Mayor's Court, or Court of Aldermen of the outer chamber, which is a court of record of law and equity, has jurisdiction of the distribution of intestates' estates, and the custody and education of citizens' orphans.

This branch of the equitable jurisdiction is exercised by the Mayor's Court, in the character of a Court of Orphans; which exercises a similar control over citizens' orphans to that which the Court of Chancery does over infants in general.

By a law made at an Assembly, held at Philadelphia the 10th day of the 1st month (March) 1683, it was enacted, that the justices of each respective county court shall sit twice every year, to inspect and take care of the estates, usage, and employment of orphans, which shall be called the Orphans' Court, and sit the first third day of the week, in the first and eighth months yearly, that care may be taken for those that are not able to take care of themselves; which court, in the laws about testates' and intestates' estates, passed in 1693, is called the *Court of Orphans*.

The proprietary, in his letter of the 16th of the 6th month, called August, 1683, thus describes this court,—" and spring and fall, there is an *Orphans' Court* in each county, to inspect and regulate the affairs of *orphans* and *widows*."

We perceive, therefore, that William Penn brought with him

from the city of London, whose customs and usages were followed in many particulars by his favourite city of Philadelphia, a construction of the word orphan which included a fatherless child. This was the familiar understanding of the word in his days, as is proved by King James's translation of the Bible, and by the writings of Shakspeare, which immediately preceded his birth, and which together form an ample and enduring record of pure and undefiled English.

In the sixth edition of Jacob's Law Dictionary, published in 1750, " orphan (orphanus) is a fatherless child;" and the same definition is given in Tomlin's Law Dictionary, 4th London edition by Granger, published in 1835; and in Wharton's Law Lexicon, published in London in·October 1847, and republished at Harrisburg in 1848, in the New Library of Law and Equity, edited by Mr. Troubat and Chief Justice Lewis and Judge McCandless, it is thus defined: " Orphan, a fatherless child or minor, or one deprived of both father and mother."

In the case of Powell *v.* The Attorney-general and Robert Pendleton, 3 *Merivale* 48, decided July 24th 1817, by Sir William Grant, Master of .the Rolls, there was a bequest of the residue of his estate, by Joseph Pendleton, " to the widows and children of seamen belonging to the town of Liverpool." Upon a reference to the master, he reported among other charities, one under the will of Elizabeth Cain, dated the 8th of June 1778, whereby she directed the residue of her estate to be continued at interest, or placed out on government securities, at the discretion of her executors, and after their death, of the rectors of Liverpool, for the time being, the interest to be paid, and distributed into and among such *poor sailors' widows and orphans, inhabitants* of Liverpool, as should in their judgment be deserving objects of charity.

The master of the rolls held, that it was a valid bequest, and that the words were sufficiently descriptive of the last of the charities, mentioned in the master's report, and a decree was made accordingly.

The subject of the orphanage share, and its distribution under the customs of London, are fully discussed by Vice-Chancellor Shadwell, in Bruin *v.* Knott, 12 *Simons* 436.

The counsel for the appellee has collected numerous instances in which the word orphan is the equivalent of fatherless child, as in the book of Lamentations, ch. 5, verse 3, " we are orphans and fatherless, and our mothers are as widows." In the translation of the Septuagint version by Charles Thomson, published in Philadelphia in 1808, the verse is rendered, " we are become orphans, our father is no more ; our mothers are like widows."

In the Psalter, in the Book of Common Prayer of the Church of England, psalm LXVIII, v. 5, reads, " he is a father of the father

[Soohan *v.* The City of Philadelphia *et al.*]

less, and defendeth the cause of the widows; even God in his holy habitation." In the metrical version of the psalms in the same book the verse is rendered,

> " 5. Him from his empire of the skies,
>   To this low world compassion draws;
>   The *orphan's* claim to patronize,
>   And judge the injured widow's cause."

See also in the Psalter, Psalm LXXXII., v. 3, and in the metrical version 2 and 3, Psalm CIX., v. 8 and 11, and in the metrical version by Brady and Tate, v. 9, 10, and 12.

In the English Bible, Psalm x., v. 18, and in the metrical version of the Psalms by Francis Rous used in the Scottish Presbyterian church, fatherless and orphan are used as synonymous; as also in Psalm CXL., v. 9, "the Lord preserveth the strangers, he relieveth the fatherless and widow; but the way of the wicked he turneth upside down," which is rendered in the metrical version,

> " The stranger's shield, the widow's stay,
>  The *orphan's* help is he;
> But yet by him the wicked's way
>  Turn'd upside down shall be."

In the Litany in the Book of Common Prayer, "that it may please thee to defend and provide for the fatherless children and widows, and all that are desolate and oppressed," which is rendered in a Latin version, published in London, in 1744, "*ut orphanis omnibus et viduis, desolatis et oppressis, prospicere digneris.*"

The word is originally Greek, and in Liddell and Scott's Greek Lexicon, it is translated " orphaned, without parents, fatherless," and in the same work, it is said, at Athens, the *orphanophulakes* were guardians of orphans, who had lost their fathers in war. In Ainsworth's Quarto Latin Dictionary, published in London, in 1761, an orphan is translated "*parentibus vel altero parentum orbatus.*"

In the first American, from the eleventh London edition of Dr. Johnson's Quarto Dictionary, published in Philadelphia, in 1819, it is defined, after giving the Greek and French words, " a child who has lost father, or mother, or both," exemplified by quotations from Spenser, Shakspeare, Sandys, Waller, Dryden, and Nelson.

In Allison's Dictionary, published in 1813, at Burlington, for M. Thomas and others, the same definition is given, and Webster's definition is substantially the same. In the American edition of Rees's Cyclopedia, published by S. F. Bradford, Murray Fairman & Co., orphan is one that is fatherless, or that has neither father or mother.

One or two cases have been cited to support the proposition that an orphan is one bereft of parents.

[Soohan *v.* The City of Philadelphia *et al.*]

By the third section of the Act of 3d April 1804, directing the mode of selling unseated lands for taxes, minors are allowed five years, after the disability is removed, to bring their action for the recovery of the lands. By the 4th section of the Act of 13th March 1815, to amend the same, the words orphan or orphans are used instead of minor. By the 20th section of the Act of 12th April 1842, and the 30th section of the Act of 25th April 1850 (*Dunlop*, pages 866 & 1098), the words orphan or orphans, in the Act of 1815, shall be construed to mean minor or minors.

In the case of Sidle *v.* Walters, 5 *Watts* 389, the word orphan, in the Act of 1815, is considered by Judge ROGERS as the equivalent of minor. In Cooper *v.* Brockway, 8 *Watts* 162, Judge HUSTON held, that land held by a father in trust for an infant child was not within the exception; and in Downing *v.* Shoenberger, 9 *Watts* 298, published in 1841, Judge HUSTON gave the definition "an orphan is one bereft of parents, a minor is one under twenty-one years of age," which was entirely extrajudicial and inapplicable to the case before him, as the father and mother of the infant were both living.

The current, therefore, of English, American, and French authority, being clearly in favour of the construction of the word orphan in the will of Stephen Girard, originally adopted and consistently pursued, we are necessarily brought to the conclusion that a fatherless child is an orphan, and if born within the limits of the city of Philadelphia, as laid out by William Penn, and existing at the death of the testator, comes within the first preference which he has chose to declare in relation to the objects of his bounty: Blenon's Estate, 1 *Brightly's Reports* 338; Plymouth Township *v.* Jackson Township, 3 *Harris* 44; Commonwealth *v.* The Erie and North-East Railroad Company, 3 *Casey* 339.

We have discussed this question at great length, but we have deemed it essential to the future management of this most munificent charity founded by a philanthropic citizen, that it should be settled now and for all time to come.

The decree is affirmed with costs.