## Girard College Trusteeship.

436

437

Argued November 21, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO and JONES, JJ.

reargument refused February 12, 1958.

*Abraham L. Freedman,* Special Counsel, and *David Berger,* City Solicitor, with them *David E. Pinsky* and *Jacob J. Siegal,* Assistant City Solicitors, for appellant, City of Philadelphia.

*Thomas D. McBride,* Attorney General, with him *Lois G. Forer,* Deputy Attorney General, for appellant, Commonwealth of Pennsylvania.

*William T. Coleman, Jr.* and *Raymond Pace Alexander,* with them *Louis H. Pollak,* for applicants, appellants.

*Arthur Littleton,* with him *Morgan, Lewis & Bockius,* for appellees, substituted trustees.

*C. Brewster Rhoads,* for Girard College Alumni, Amicus Curiae.

*Joseph P. Gaffney,* for City of Philadelphia, trustee under will of Stephen Girard, deceased, acting by the Board of Directors of City Trusts.

OPINION BY MR. CHIEF JUSTICE JONES, January 24, 1958:

When this matter was here before, we affirmed the action of the Orphans' Court of Philadelphia County denying admission to Girard College to William Ashe Foust and Robert Felder, poor male Negro orphans, for the reason that the will of Stephen Girard, the founder and endower of the College, expressly restricts admission to "poor male white orphans": see *Girard Will Case,* 386 Pa. 548, 551, 127 A. 2d 287. Although the institution is referred to as a College, the testator himself aptly termed it an "Orphan Establishment" in one of two codicils which, with the decedent's will, were probated shortly after his death in 1831.

The will nominated and appointed as trustee of the charity the Mayor, Aldermen and Citizens of Philadelphia, the then corporate title of the City, which duly entered upon its trust duties. But, for years, the Col-

lege has been administered by the Board of Directors of City Trusts of Philadelphia, a body statutorily created by the Act of June 30, 1869, P. L. 1276. The Act empowered the Board to accept and execute charitable trusts bequeathed to the City of Philadelphia, as trustee, whereof a large number, following Girard's lead, had come into existence: see *Philadelphia v. Fox*, 64 Pa. 169, 172 et seq. For the proper administration of the trusts committed to it, the Board of City Trusts is accountable to the Orphans' Court of Philadelphia County: *Wilson v. Board of Directors of City Trusts*, 324 Pa. 545, 188 A. 588. That court, deeming the Board of City Trusts to be like any other trustee which is a creature of statute and authorized to accept and administer private trusts, held by its decrees, which we affirmed, that the Board of City Trusts was bound to abide faithfully by the restrictions which Girard's will imposes on admissions to the College.

However, the Supreme Court of the United States reversed our judgment of affirmance and remanded the cause for further proceedings not inconsistent with that Court's opinion which held that the Board of City Trusts is an agency of the State of Pennsylvania and that, even though the Board was acting as a trustee, its refusal to admit Foust and Felder to the College because they were Negroes was discrimination by the State which is forbidden by the Fourteenth Amendment, citing *Brown v. Board of Education*, 347 U. S. 483: see *Pennsylvania v. Board of Trusts*, 353 U. S. 230.

In obedience to the Supreme Court's mandate, we vacated the decrees of the Orphans' Court and remanded the cause to that court "for further proceedings not inconsistent with the opinion of the Supreme Court of the United States as set forth in its said mandate,"

a true and correct copy thereof being appended to our order of remand.

The Orphans' Court, construing the Supreme Court's opinion to mean no more than that the Board of City Trusts was constitutionally incapable of administering Girard College in accordance with the testamentary requirements of its founder, entered decrees removing the Board as trustee of Girard College and substituting for that purpose thirteen private citizens none of whom holds any public office or otherwise exercises any governmental power under the Commonwealth of Pennsylvania or any of its political or municipal subdivisions. It is these decrees which are now before us for review on the separate appeals of Foust, Felder, the Commonwealth of Pennsylvania and the City of Philadelphia (the State and City having voluntarily become parties to the proceedings). Simply stated, the question for decision is whether the action of the Orphans' Court is inconsistent with the opinion of the Supreme Court of the United States.

It is the appellants' contention that the Supreme Court's mandate required the Orphans' Court to order the Board of City Trusts to admit Foust and Felder to Girard College forthwith. With that, we cannot agree. Had the Supreme Court so intended, it would have said so just as it did in *Sweatt v. Painter,* 339 U. S. 629 (1950), where there was involved a state-supported University's denial of admission to a Negro because of his race. The order of reversal in the *Sweatt* case also included a remand of the cause for further proceedings not inconsistent with the Supreme Court's opinion but, immediately preceding, and as a part of the order of reversal, there is the specific ruling by the Court that "the Fourteenth Amendment requires that petitioner be admitted to the University

of Texas Law School." The mandate in the instant case contains no such directive.

The appellants' effort to make a "segregation" issue out of Stephen Girard's private charity, merely because of the inability of the Board of City Trusts, as trustee, to comply with the donor's express directions, serves only to confuse and obscure the real issue involved as to the right of a private individual to bequeath his property for a lawful charitable use and have his testamentary disposition judicially respected and enforced. In *Holdship v. Patterson,* 7 Watts 547, 551 (1838), Mr. Chief Justice GIBSON pertinently stated that a testamentary benefactor "has an individual right of property in the execution of the trust, and to deprive him of it would be a fraud on his generosity. To appropriate a gift to a purpose *or person* not intended, would be an evasion of the donor's private dominion" (Emphasis supplied). As lately as *Borsch Estate,* 362 Pa. 581, 586, 67 A. 2d 119 (1949), we recognized, as constitutionally safe-guarded, the right of a benefactor to have enforced the limitations and restrictions affixed to his testamentary gift. The exercise of that right is but one of the manifestations of the right of private property which is fundamental to our social, economic and political order and whose preservation unimpaired is as vital to our Negro citizens as it is to their white brethren.

As we read the Supreme Court's opinion, what it holds, and all that it was presumably intended to hold, in view of what was then before the Court, is that the Board of City Trusts, being a State agency, is incapable of administering Girard College in strict compliance with the founder's prescribed racial restriction on admissions without being guilty of a violation of the Fourteenth Amendment. However, the Supreme Court did not say that there is any Constitutional or

other legal barrier to the removal of the Board of City Trusts as trustee of Girard College in order that the Orphanage can be administered in accordance with all of the testator's express directions including the qualifications for admission to the student body. On the other hand, there is high authority for such procedure where a trustee is either unable or fails or refuses to administer a trust in accordance with the lawful directions of the settlor.

In *Vidal et al. v. Girard's Executors*, 43 U. S. (2 Howard) 126, 188 (1844), which was concerned with an attempt by Stephen Girard's heirs to nullify the Girard Trust, one of the grounds of attack was that the City of Philadelphia, a municipal corporation, was legally incapable of executing the trust. In rejecting this contention Mr. Justice STORY, speaking for the Supreme Court, said: "It is true that, if the trust be repugnant to, or inconsistent with the proper purposes for which the corporation was created, that may furnish a ground why it may not be compellable to execute it. But that will furnish no ground to declare the trust itself void, if otherwise unexceptionable; but it will simply require a new trustee to be substituted by the proper court, possessing equity jurisdiction, to enforce and perfect the objects of the trust."

Subsequent to the "Consolidation Act" of February 2, 1854, P. L. 21, which enlarged the physical area of the City of Philadelphia by incorporating therein outlying territory, Girard's heirs renewed their attack on the trust. The case again went to the Supreme Court of the United States where it was argued that the "Consolidation Act" had "either dissolved or destroyed the identity of the original corporation [City of Philadelphia], and it is consequently unable any longer to administer the trust." Mr. Justice GRIER, who delivered the opinion of the Court, said, "Now,

if this were true [that the City could no longer act as trustee of the Girard Estate], the only consequence would be, not that the charities or trust should fail, but that the chancellor should substitute another trustee": *Girard v. Philadelphia,* 74 U. S. (7 Wall.) 1, 12, 13 (1868).

The inability of the Board of City Trusts to apply constitutionally the racial criterion prescribed by the testator for admissions to Girard College affects *the trustee* and *not the trust.* As the opinion for the Orphans' Court so well states, "It is a universally accepted rule of law that the disqualification or incompetency of a trustee shall not be permitted to defeat the purposes of a charitable trust, nor to impeach its validity, nor to derogate from its enforcement—the trustee must be fitted to the trust and not the trust to the trustee." It necessarily followed, therefore, that the course to be pursued in order that the trust may continue to be fully effectuated in accordance with the benefactor's intent was not to obliterate by judicial fiat an express term of his will which, as a private individual, he had a legal right to impose (see *City of Philadelphia v. Girard's Heirs,* 45 Pa. 9, 26) but for the court, which has jurisdiction of the trust and its fiduciary, to appoint substitute trustees capable of carrying out the testator's lawful prescriptions. And, that is precisely what the Orphans' Court has done.

The appellants argue, however, that "As a result of legislative implementation and City management, Girard College has taken on a public character" and must, therefore, be administered as a public charity by a public body subject to the inhibitions of the Fourteenth Amendment. We are unable to perceive the slightest basis for the contention either in Girard's will or in legislation passed in relation to the Girard Estate.

The testator's primary and dominant object was to found a private charitable institution for the training, education and maintenance of poor male white orphans. Thus, his will expressly declares: ". . . I am *particularly desirous* to provide for such a number of *poor male white orphan children,* as can be trained in one institution, a better education as well as a more comfortable maintenance than they usually receive from the application of *public* funds . . . ." He directed that certain physical things be done on the land he devised for the College "so that the establishment [i.e., the College] may be rendered secure and *private.*" And, upon devoting, secondarily, specified income from the trust fund to the promotion of the prosperity of the City and the health and comfort of its inhabitants, the testator directed that such income should be applied yearly for the indicated purposes but only "after providing for the College as hereinbefore directed, as my *primary object*" (all emphasis above supplied).

It is not possible to read Girard's will without being deeply impressed with the fact that it was *the College, as a private charity,* and *not the trusteeship of the City,* that was the primary object of the donor's testamentary scheme. Of course, a trustee was a necessary and unavoidable incident of the trust, and the testator, desiring the continuity of the institution, availed himself of the services of the only existing local corporate body capable of administering the trust in perpetuity. What the will so clearly reveals as to the intended paramountcy of the private charity has long since been judicially recognized. In *Girard v. Philadelphia,* supra, the Supreme Court of the United States spoke of the College, just as the testator had done, as the "primary object" of the three objects to which the income of the whole residuary estate was to be devoted. Cf. also *Vidal et al. v. Girard's Execu-*

*tors,* supra. And, in *City of Philadelphia v. Girard's Heirs,* supra, this court, in construing the Girard will, declared that its dispositive portion was "a devise of all the residue of his real and personal estate to the city of Philadelphia, an existing corporation, in trust, as his 'primary object', to construct, furnish, constitute, and maintain the institution now known as the Girard College . . . ."

The private character of the trust and the privacy of the Orphanage which the trust was established to maintain and administer were aptly described in *Girard Will Case,* supra, as follows: "All provisions of the will show that it was not intended to be a public school; indeed, it is not merely a school at all but what Girard himself called in a codicil to his will, an 'Orphan Establishment,' a home where the fatherless boys eat, sleep, study and live together, enjoying the testator's bounty which provides for them not only an education but also lodging, board, clothing and all the necessities of life. . . . Girard College is a comparatively large institution, but no different legal principles apply to it for that reason than to the smallest of private schools. It is erected on land owned by Girard and the buildings were constructed with his own funds. . . . The college has been supported and maintained for now over a century by Girard's estate; not a penny of State or city money has ever gone into it; no taxpayer has ever been called upon to contribute to it; true, it is exempt from local taxation, but so are all other charities even though restricted as to their beneficiaries and managed by private trustees."

The statutes and ordinances which the appellants urge as having made a public trust of Girard College did not so operate. Certain it is that no additional legislation was required to clothe the City with the fiduciary powers necessary for the administration of

Girard College. The Supreme Court said in this very connection in *Vidal et al. v. Girard's Executors*, supra: "We think, then, that the charter of the city does invest the corporation with powers and rights to take property upon trust for charitable purposes, which are not otherwise obnoxious to legal animadversion; and, therefore, the objection that it is incompetent to take or administer a trust is unfounded in principle or authority, under the law of Pennsylvania." The legislative enactments which the appellants stress were designed in large part to enable the Commonwealth and the City to receive and use for their governmental purposes pecuniary legacies bequeathed directly to them by Girard's will. The rest of the legislative enactments were purely administrative measures neither envisioned nor required by Girard's will. And, the same can be said for the ordinances which the appellants cite.

What Mr. Chief Justice LOWRIE so clearly recognized for this court in *Philadelphia v. Girard's Heirs*, supra, is peculiarly apposite here: "In all gifts for charitable uses the law makes a very clear distinction between those parts of the writing conveying them, which declares the gift and its purposes, and those which direct the mode of its administration. And this distinction is quite inevitable, for it is founded in the nature of things. We must observe this distinction in studying Mr. Girard's will, otherwise we run the risk of inverting the natural order of things by subordinating principles to form, the purpose to its means, the actual and executed gift for a known purpose to the prescribed or vaticinated modes of administering it, that are intended for adaptation to an unknown future, and of thus making the chief purpose of the gift dependent on the very often unwise directions prescribed for its future security and efficiency."

Little less than startling is the suggestion that the State or City could, by legislation enacted by either of them after Girard's death, alter or affect the terms of his will respecting the creation and administration of Girard College which did not call for or require legislation to make it an operating charitable institution. There is nothing in the testator's will or in any legislation by the Commonwealth or the City that serves to make Girard College a public charity or that requires that it be publicly administered. On the contrary, we hold, on the basis of the compelling testamentary evidence, already noted, that Girard College is a private charity capable of being lawfully administered by private trustees.

In removing the Board of City Trusts as trustee of Girard College and in substituting the private individuals as trustees for that purpose, the Orphans' Court acted well within its jurisdiction and powers. It has had jurisdiction over testamentary trusts at least since the Act of March 29, 1832, P. L. 190, §4: see *Wilson v. Board of Directors of City Trusts,* 324 Pa. 545, 548, 188 A. 588, where it was said that "Whatever may have been the uncertainty as to the jurisdiction of the orphans' court prior to 1832, the Act of March 29, 1832, P. L. 190, Section 4, and the decisions which followed it, cleared away. It provided that the jurisdiction of the several orphans' courts shall extend to and embrace trustees who are accountable in any way for the property of a decedent." It has also had jurisdiction over trusts for the benefit of orphans since the Act of March 27, 1713, 3 Pa. Stat. at Large 14, Chap. 197.

The Fiduciaries' Act of April 18, 1949, P. L. 512, §331(5), which is the presently applicable statute, confers exclusive power on the Orphans' Court to remove a trustee "when, for any other reason, the interests of

448

the estate are likely to be jeopardized by his continuance in office." Over and above such statutory power, it has long been established that the Orphans' Court possesses the power of a court of chancery in aid of an exercise of its jurisdiction: see *Stevens's Estate,* 200 Pa. 318, 322, 49 A. 985. What was said there in the opinion of the court below, whereon this court affirmed *per curiam,* is presently so pertinent as to justify the following quotation: "The courts of Pennsylvania have looked with favor upon charities, and the law of the state, as administered from the beginning of this province, has always been broad enough to discern the objects of every charity and to preserve and enforce it, notwithstanding any defect, such as want of power in the trustees or otherwise: The Apprentices' Fund Case, 13 Pa. C. C. Rep. 241. Therefore, when a charity is established in any manner, such a slight impediment as a defect or want of power in the trustee to execute it does not stand in the way; the charity remains; the trustee is declared incapable of acting, and a competent trustee is appointed in his place. Chancery here steps in to enforce it and commits it to some one who may lawfully administer it: Frazier v. St. Luke's Church, 147 Pa. 256."

The contention which the appellants advance that the Act of 1869, supra, which created the Board of Directors of City Trusts, divested the Orphans' Court of any power to remove the Board of City Trusts as trustee is utterly lacking in merit. As this court recognized in *Philadelphia v. Fox,* 64 Pa. 169, 183 (1870), all that the Act of 1869 did was to make a change in the internal organization of the municipality by providing that one class of its functions (i.e., as fiduciary for private charities) should be administered in a manner different from what it had been theretofore. In *Wilson v. Board of Directors of City Trusts,* supra,

where the Orphans' Court was held to possess plenary powers over trusts administered by the Board of City Trusts, it was pointed out that "The Act [of 1869] in no way ousted [the Orphans' Court's] jurisdictional control, and the fact that [the Act] required reports to be made to the City Council and others did not divest the orphans' court of the normal control that it had hitherto exercised over all trust estates created by will. Its power has been recognized since the passage of that Act."

No useful purpose would be served by discussing at greater length the jurisdiction of the Orphans' Court over testamentary trusts and their fiduciaries or the power of that court to remove a trustee who is incapable or fails or refuses to carry out a trust as its creator directed. Such a situation calls for the removal of the incapable trustee and the substitution of a fiduciary able to administer the trust as its provisions require; and the jurisdiction and power of the Orphans' Court to that end is not open to question. Here, there is a conclusively adjudicated want of capacity in the Board of City Trusts to administer Girard College in accordance with the intention and directions of the testator's will. There was, therefore, nothing other for the Orphans' Court to do in the circumstances but to remove the inhibited trustee and appoint trustees capable of administering the College as Stephen Girard intended and prescribed.

The appellants assert that the action of the Orphans' Court in removing the Board of City Trusts and in substituting therefor trustees capable of administering Girard College in accordance with the settlor's directions constituted State action which denied to the minor applicants the equal protection of the laws guaranteed them by the Fourteenth Amendment. As support for this contention, they cite *Shelley v.*

*Kraemer,* 334 U. S. 1, and *Barrows v. Jackson,* 346 U. S. 249. The pertinently distinguishing feature of those cases is that in each of them it was a *constitutionally guaranteed right* of an individual that was subjected to the inhibited discrimination based on race or color. No such right is involved here, as we believe will clearly appear.

Concededly, it has long been authoritatively established that an official act of a member of a State's judiciary constitutes State action within the contemplation of the Fourteenth Amendment. No one will gainsay that. See *Ex Parte Virginia,* 100 U. S. 339; also, *Shelley v. Kraemer* and *Barrows v. Jackson,* supra. The fallacy in the appellants' argument lies in the fact that the complained-of discrimination in the instant case does not impinge upon any *civil right* to which the minor petitioners have a constitutional claim along with all other members of the community. Not coming within the qualifications required by Stephen Girard's will for admission to his Orphanage, the present applicants have no right to be beneficiaries thereof in defiance of the settlor's plainly expressed and legally valid testamentary provisions. Neither *Shelley v. Kraemer* nor *Barrows v. Jackson,* supra, teaches otherwise.

On the contrary, in *Shelley v. Kraemer,* where a party to a racially restrictive agreement relative to private property sought equitable enforcement of the covenant against Negro purchasers of portions of the restricted property, the Supreme Court took occasion to observe, first of all, that "among the civil rights intended to be protected from discriminatory state action by the Fourteenth Amendment are the rights to acquire, enjoy, own and dispose of property" and then declared that "Equality in the enjoyment of property rights . . . [is] an essential pre-condition to the

realization of other basic civil rights and liberties which the Amendment was intended to guarantee." The undisputed facts in the *Shelley* case made it clear that, but for the active intervention of the State court, the Negro purchasers would have been free to occupy the properties in question without restraint. Thus, the State had made available to the covenantees the full coercive power of government to deny to the Negro purchasers, on the ground of race or color, their constitutional right to own and enjoy property which they were willing and financially able to acquire and which the grantors were willing to sell. As contrasted by the Supreme Court, "The difference between judicial enforcement and non-enforcement of the restrictive covenants is the difference to the petitioners between being denied rights of property available to other members of the community and being accorded full enjoyment of those rights on an equal footing." In the instant case, no one not possessing the qualifications prescribed by Girard's will for admission to the Orphanage can claim any right that entitles him to share Stephen Girard's largesse on an equal, or any, footing with those whom Girard himself expressly made the beneficiaries of his bounty.

*Barrows v. Jackson* was also a suit by a covenantee of a racially restrictive agreement, brought to recover from a breaching covenantor the contractually stipulated damages due for selling restricted property to a Negro. The only parties to the suit were the signatories to the restrictive agreement. No attempt was made to enjoin the Negro purchaser from enjoying the property which he had so acquired. The State court, on the rationale of the *Shelley* case, denied the plaintiff a recovery. The Supreme Court, in affirming the judgment of the State court, reasoned as follows: "To compel respondent to respond in damages would be for

the State to punish her for her failure to perform her covenant to continue to discriminate against non-Caucasians in the use of her property. . . . If the State may thus punish respondent for her failure to carry out her covenant, she is coerced to continue to use her property in a discriminatory manner, which in essence is the purpose of the covenant."

Thus in *Barrows,* just as in the *Shelley* case, although in a different form of action, it was the supplicated judicial enforcement of a claim arising out of a racially restrictive covenant in impairment of a Negro's constitutionally guaranteed civil right that was deemed to be discrimination by State action which the Fourteenth Amendment inhibits. This seems plain enough, for, immediately after referring to the effects of the restrictive covenant on the owner's exercise of her property rights, the Supreme Court at once said, —"The next question to emerge is whether the state action in allowing damages deprives anyone of rights protected by the Constitution". Thereupon, the Court concluded that the State action did so operate, saying,—"If a state court awards damages for breach of a restrictive covenant, a prospective seller of restricted land will either refuse to sell to non-Caucasians or else will require non-Caucasians to pay a higher price to meet the damages which the seller may incur. Solely because of their race, non-Caucasians will be unable to purchase, own, and enjoy property on the same terms as Caucasians. Denial of this right by state action deprives such non-Caucasians, unidentified but identifiable, of equal protection of the laws in violation of the Fourteenth Amendment. See *Shelley,* supra."

Nowhere in *Shelley v. Kraemer* or in *Barrows v. Jackson* did the Supreme Court denounce as void the restrictive covenants respectively involved in those

cases. Such covenants are recognized as valid *inter partes* so long as they are adhered to voluntarily. Notwithstanding the discriminatory nature of a covenant restricted on the basis of race or color, no one can compel the covenantor to sell his property in violation of his restrictive agreement or otherwise force him to desist from abiding by his covenant. To do so would be to invade *his* constitutionally guaranteed right of dominion over his own property. And, that would be no less true of Stephen Girard's trust were we to hold that, because of his testamentary limitation on admissions to Girard College to "poor male white orphans", he has been guilty of an unconstitutional discrimination by virtue of the Fourteenth Amendment, wherefor all *poor male* orphans, regardless of color, are eligible for admission to that institution.

The elements which brought the "equal protection" clause of the Fourteenth Amendment into play in *Shelley v. Kraemer* and *Barrows v. Jackson* consisted of State action for the enforcement of a discrimination based on race or color in impairment of a constitutionally protected right of an individual to which he, along with all other members of the community, is entitled as a matter of public law. It is plain enough from the words of the Fourteenth Amendment that it is "laws", and not claims under some private testament, whereof the Amendment guarantees everyone "equal protection". Manifestly, therefore, an element essential to the invocation of the "equal protection" clause of the Fourteenth Amendment is absent in this case.

We are not unmindful that, when the Supreme Court reversed our former action in this case and remanded the record for further proceedings not inconsistent with its opinion, there was likewise present only the action of the State agency as trustee of Girard College and the racial discrimination on admissions

imposed by Girard's will which the trustee was en-forcing. In short, then as now, there was no violation of a constitutionally protected right possessed alike by everyone. We have already indicated our belief that, had the Supreme Court intended that the court below, having jurisdiction and supervisory control over the trustee of Girard College, should admit the Negro applicants forthwith, it would have plainly said so just as it did in *Sweatt v. Painter*, supra. This deduction is, of course, a negative approach to the intended scope of the Supreme Court's ruling. Our positive interpretation of it is that *a State agency*, even when acting as the trustee of a private charity, can have *no part* in the enforcement of a racially discriminatory restriction regardless of what type of rights it affects. It need hardly be remarked that, had our study of the Supreme Court's opinion led us to the conclusion that no trustee, other than the Board of City Trusts, can lawfully administer Girard College, we would have been alert to carry out the ruling to the full extent of its implications.

Furthermore, if all that is necessary to constitute a denial of equal protection of the laws in violation of the Fourteenth Amendment is State action and a racial or religious discrimination, then no private charity created by will can any longer dispense its benefits on the basis of race, creed or color according as its settlor has stipulated. A will is without any force or effect whatsoever until it is probated. This is so elementary as not to require citation of authority; and, equally fundamental it is that the admission of a will to probate constitutes judicial action whether it be by the register, the surrogate or some other officer thereunto authorized by law. It is plain enough, therefore, that State action is necessary to effectuate a will which creates a private charity whose benefits are dispensed

on the basis of race, creed or color. What keeps such a charity, so created and restricted, from constituting a violation of the "equal protection" clause of the Fourteenth Amendment is that no one who does not come within the settlor's definition of beneficiary has a constitutionally protected right (or any right for that matter) to share in the charity's benefits.

Further dissimilarity between the *Shelley* and *Barrows* cases on the one hand and the instant case on the other is in the fact that in the former cases the full power of the State by way of court enforcement of the racially restrictive covenants was sought and relief refused, while in the present instance all that has happened is that, in the course of the proceeding instituted by the two Negro boys for admission to Girard College, the Orphans' Court, having been authoritatively advised that the Board of City Trusts is incapable of administering Girard College as its founder directed, removed the incapable trustee and appointed other fiduciaries who can administer the College in the manner Stephen Girard prescribed. In so doing the Orphans' Court did no more than it would do in any case upon ascertaining that a trustee was no longer capable of discharging his fiduciary duties competently and adequately.

The appellants argue, however, that, because the substituted trustees will continue to restrict admissions to Girard College to poor male orphans of a particular race, whom Girard by his will specified as alone eligible for admission, the action of the Orphans' Court will deny the present applicants of a different race the equal protection of the laws guaranteed them by the Fourteenth Amendment. In aid of this argument, the appellants unwarrantedly charge that the Orphans' Court's exercise of its judicial power in the premises was "for the sole purpose of excluding

Negroes from Girard College" and that the action "was taken solely in order to enable the school to remain segregated." The Orphans' Court did not act to *exclude* Negroes from Girard College. None had ever been admitted. What the Orphans' Court did was to refuse to admit the Negro applicants because they did not qualify for admission under the terms of Girard's will. And, to speak of Girard College as remaining "segregated" as a result of the Orphans' Court action is to use a term whose present-day stigmatizing connotation has no proper place in this case.

The appellant City persists in its complaint that it was denied procedural due process by the Orphans' Court's entry of its decrees, after the remand, without further hearing before that court. Brief reference to the procedural steps pursued in this litigation will at once disclose that all parties have been fully heard. Hearings on the petitions of Foust and Felder were held for days before the Orphans' Court where testimony was taken *in extenso* and the matter thoroughly argued by counsel. Exceptions to the hearing judge's decrees were filed and thereafter argued by counsel for appellants before the court sitting *en banc*. Following entry of the final decrees, the matter was appealed to this court and then carried to the Supreme Court of the United States. When the cause was lately remanded to the Orphans' Court pursuant to the Supreme Court's mandate, there was no occasion for any further hearing in the matter. The record was complete. It was the duty of the Orphans' Court, just as it is our duty now, to proceed in a manner not inconsistent with the opinion of the Supreme Court. And, that, we think we are doing.

The decrees are affirmed at the cost of the Commonwealth of Pennsylvania and the City of Philadelphia.

Mr. Justice Arnold and Mr. Justice Cohen took no part in the consideration or disposition of these appeals.

___

DISSENTING OPINION BY MR. JUSTICE MUSMANNO.

In May, 1777, Stephen Girard of Bordeaux, France, landed in Philadelphia where he took up permanent residence and entered into business. Success smiled on his various commercial enterprises and, as ship owner, banker, and merchant, he accumulated an amount of wealth that made his name one to be conjured with on the American Rialto. As he climbed the ladder of financial achievement he held aloft at all times the flag of gratitude for the opportunities afforded him in the New World. He became a citizen of the United States and was elected a member of the Philadelphia "City Councils."

In 1830, having reached that age when a good man contemplates how the shadow of his life may still be helpful to the living after he will have departed, he went into consultation with a scrivener, his conscience, his sense of appreciation and undying spirit of patriotism. From the conference emerged his last will and testament which, when probated in 1831, shone as a lyrical paean to Philadelphia which he loved with a devotion akin to that which Cincinnatus is reputed to have borne toward Rome. Girard revealed through this last writing that he could not do too much for the City which had been a foster mother to him. He left her funds with which to lay out new streets, pave and widen others, remove wooden houses, cleanse the docks on the Delaware, and supply water for various sections of the City. He provided for a competent police force, a division of the City into "watch districts," and in general made available facilities to "improve the city property, and the general appearance of the

city itself; and, in effect diminish the burden of taxation, now most oppressive especially on those, who are the least able to bear it."

The will of Julius Caesar, dramatically proclaimed to the populace by Marc Antony, which gave to every Roman citizen the sum of 75 drachmas* and to the general citizens the right to breathe fresh air in his "private arbours and orchards," was a rather paltry posthumous gift in comparison to what Girard gave to Philadelphia.

Girard was generous to public charitable institutions as the Philadelphia Hospital, the Pennsylvania Institution for the Deaf and Dumb, the Orphan Asylum of Philadelphia, and various other organizations for relief of the poor and the distressed.

He bestowed a legacy on the public schools of Philadelphia. He bequeathed $300,000 to the Commonwealth of Pennsylvania for internal improvements by canal investigation. He left some modest sums to relatives, friends, and servants, but the mass of his estate was dedicated to the public welfare. Thus, he said: "And whereas, together with the object just adverted to, *I have sincerely at heart the welfare of the city of Philadelphia,* and, as a part of it, am desirous to improve the neighborhood of the river Delaware, so that the health of the citizens may be promoted and preserved, and that the eastern part of the city may be made to correspond better with the interior: Now, *I do give devise and bequeath all the residue and remainder of my real and personal estate of every sort and kind and wheresoever situate . . . unto 'The Mayor, Aldermen and citizens of Philadelphia' their successors*

---

* According to Everyman's Smaller Classical Dictionary by E. H. Blakeney and J. Warmington the modern equivalent of a drachma would be about 8 pence; so that the prodigal Caesar left to each Roman citizen approximately twelve dollars.

*and assigns in trust to and for the several uses intents and purposes hereinafter mentioned and declared of and concerning the same."** 

Of this residue in trust he allocated two million dollars for the establishment of a college for "poor white male orphans." This college later became known as the Girard College and is the subject of the instant litigation.

It is difficult to visualize the will of a private individual more dedicated to public business than Stephen Girard's. Schools, streets, docks, canals, river distribution, public hospitals and asylums are items which one finds in the budget of nations, states, and municipal corporations, not private householders. These are matters for the consideration of the State, and indeed the State of Pennsylvania recognized that fact at once.

Only three months after Girard's death the General Assembly of Pennsylvania (on March 24, 1832, P. L. 176) enacted legislation directing the City of Philadelphia to carry into effect the will of Stephen Girard.

Two weeks later, (Apr. 4, 1832, P. L. 275) by statute, Pennsylvania authorized the City of Philadelphia to provide "for the election or appointment of such officers and agents as they deem essential to the due execution of the duties and trusts enjoined and created by the will of Stephen Girard."

On February 27, 1847, (P. L. 178), the Legislature passed a special Act making Philadelphia the guardian of the person and property of every child admitted to Girard College. The same Act authorized Philadelphia to bind out Girard College orphans to suitable occupations from the age of 14-18 to 21.

---

* Italics throughout, mine, unless otherwise indicated.

The college was opened on January 1, 1848, under the direct management, supervision, and authority of City Council. The City Council ran the college as authoritatively and completely as an engineer runs a locomotive. From March 21, 1833, until December 18, 1869, the City Council passed 48 ordinances dealing exclusively with Girard College. The ordinances covered such subjects as erection of buildings, the appointment of architects, purchase of construction materials, buying of books, desks, blackboards and other educational paraphernalia, appointment of committees to administer the college, the making and approving of contracts appertaining to the college in all its various phases of activities, the appointment of, and payment of salaries to principals, teachers, janitors, and other employees, organization of faculty and courses of instruction, employment of counsel, etc., etc.

The General Assembly of Pennsylvania at no time relinquished its control over Girard College and it never relaxed its concern to make of the enterprise an institution worthy of the State. On April 20, 1853, (P. L. 624), it passed an Act providing that "the mayor, aldermen and citizens of Philadelphia, or such persons as they shall direct and appoint, shall bind by indentures as apprentices, the orphan children in the Girard College for Orphans."

By 1869 it became evident to the State Legislature that the normal duties pressing upon a City Council in governing a large metropolitan city the size of Philadelphia were too many and onerous to allow for an active management, superintendency and operation of a college. Accordingly, on June 30, 1869 it passed an Act (P. L. 1276) creating the Board of Directors of City Trustees to be composed of the Mayor of Philadelphia, the Presidents of Select and Common Councils and twelve other citizens to be appointed by the

judges of the Court of Common Pleas of Philadelphia County. This Board, which came to be known as the Board of City Trusts, took over the direct and immediate management of Girard College. Under its direction and control the College flourished. The $2,-000,000 originally bequeathed has now, through good business methods, as well as wise and careful investing, become $98,000,000, with an annual income of $2,000,000. The real property of the Girard estate is worth $10,000,000. Over Girard College hovered not a cloud of apprehension or fear for the future, until the Orphans' Court of Philadelphia entered an order which has brought about the lamentable state of affairs which is the subject of the present litigation.

On September 24, 1954, two Negro fatherless boys, William Ashe Foust and Robert Felder, aged 8 and 7 years respectively, applied for admission to Girard College on the basis that they qualified in every respect under existing law to meet entrance requirements. The Board of City Trusts rejected the applications, asserting that it had no power to admit "other than white boys to Girard College." The boys, as well as the City of Philadelphia and the Commonwealth of Pennsylvania, petitioned the Orphans' Court to order the admittance of the orphan applicants. The Orphans' Court dismissed the petitions. This Court on November 12, 1956, affirmed the action of the Orphans' Court, thus excluding Foust and Felder from Girard College. (386 Pa. 548).

On appeal thereto, the Supreme Court of the United States, on April 29, 1957, reversed the judgment of this Court, with the declaration that: "The Board which operates Girard College is an agency of the State of Pennsylvania. Therefore, even though the Board was acting as a trustee, its refusal to admit Foust and Felder to the college because they were

Negroes was discrimination by the State. Such discrimination is forbidden by the Fourteenth Amendment. Brown v. Board of Education, 347 U S 483." It accordingly remanded the cause "for further proceedings not inconsistent with this opinion."

This Court, then, on June 28, 1957, vacated the decrees of the Orphans' Court excluding Foust and Felder and remanded the cause to the Orphans' Court "for further proceedings not inconsistent with the opinion of the Supreme Court of the United States as set forth in its said mandate."

On September 11, 1957, the Orphans' Court of Philadelphia County, without any hearing and without allowing Foust, Felder, the City of Philadelphia, or the Commonwealth of Pennsylvania, who are all party litigants, an opportunity to be heard in argument or otherwise, dismissed the petitions of Foust and Felder and ordered the removal of the Board of Directors of City Trusts. On October 4, 1957, the same Court appointed thirteen named persons as trustees of the Girard Estate on the assumption that, being private individuals, they would not be subject to the restrictions of the Fourteenth Amendment and could accordingly legally exclude Foust and Felder from the Girard College because they are Negroes.

I pass over without discussion the action of the Orphans' Court in refusing the parties a hearing on so momentous a piece of litigation. To dwell on this manifest denial of due process of law would be to expatiate on the obvious, emphasize the glaring, and underline the italics of the horizon. But, putting aside the Court's palpable denial of the fundamental right of every litigant to be heard before a cause is adjudicated against him, I submit that there was ample reason for this Court to reverse the Orphans' Court because its errors in the disposition of this case have not been

merely procedural, spasmodic, or minor; they have been constant, undeviating, and monumental.

In its opinion of September 11, 1957, the Orphans' Court said: "It is a universally accepted rule of law that the disqualification or incompetency of a trustee shall not be permitted to defeat the purposes of a charitable trust, nor to impeach its validity, nor to derogate from its enforcement—the trustee must be fitted to the trust and not the trust to the trustee."

But the Supreme Court did not say that the Board was disqualified or incompetent because it refused to admit Foust and Felder to Girard College. It only said that under the law of the land, the Board could not exclude these children. No one charged the Board with misconduct, no one complained that its management of the Stephen Girard was not exemplary, no one moved for dismissal of the Board. The Act of June 30, 1869, which brought the Board into existence has not been repealed or its powers minimized. By what authority may the Orphans' Court of Philadelphia County nullify an Act of the General Assembly?

Nor did the Supreme Court say that if the Board of City Trusts was removed as trustee, its successor could exclude Negroes from Girard College.

The fact of the matter is that no trustee, no matter how appointed, may practice in the Girard College a discrimination which is forbidden by the Fourteenth Amendment. The Girard College, because of the nature of its origin, its legislative history, its councilmanic management, its municipal control and subservience to governmental supervision is as much a public institution as the University of Pennsylvania and is, therefore, bound by the decision of the Supreme Court of the United States in *Brown v. Board of Education,* 347 U. S. 483.

It is no answer to this statement to say that the Girard College had its genesis in private funds. The Commonwealth of Pennsylvania was once a private grant and the Island of Manhattan once belonged to a private tribe of Indians.* Land and institutions may become public through purchase, through dedication, and through use. Girard College is public because Girard so planted it and because its whole growth has been accomplished in the orchard of governmental care.

A reading of the will should be enough in itself to convince the mind that Girard brought into play every possible trumpet of the English language to proclaim that his whole fortune was to be devoted to the public welfare irrevocably. With the exception of a few small bequests, long ago satisfied, Girard's entire estate is now in the hands of the City of Philadelphia. In the case of *Soohan v. City of Philadelphia,* 33 Pa. 21, 28, this Court said: "This sacred trust was confided by Stephen Girard to the mayor, aldermen, and citizens of Philadelphia, who, by legislative enactment, have been succeeded by the City of Philadelphia . . . The directors of the Girard College are the creatures of an ordinance and *are merely the agents of the real trustee, the city.*"

Girard was so determined to prevent his estate from falling into the classification of a private institution that he declared that if the City of Philadelphia failed to carry out the provisions of his will, his estate would pass to the Commonwealth of Pennsylvania, and if the State violated his wishes, the United States would be-

---

* The City Solicitor of Philadelphia well says in his excellent brief that: "The private property owned by Girard at the time of his death no longer exists, except in a highly mystical sense."

come the final beneficiary. Is it not evident, then, that the action of the Orphans' Court, in turning the Girard estate over to private individuals, strikes at the very jugular vein of Girard's expressed intentions?

As a matter of law, the Orphans' Court cannot give away Girard College any more than it can give away a public park or City Hall.

The Supreme Court of the United States in its Opinion on April 29, 1957, said: "The will named as trustee the City of Philadelphia. The provisions of the will were carried out by *the State and City* and the college was opened in 1848."

If litigation had arisen over some college action performed in 1848, there could be no doubt, under this language of the Supreme Court, that, as of 1848, Girard College would be accepted as a public institution. How much more must it be a public institution today when we realize that since 1848 the City of Philadelphia and the Commonwealth have exercised unceasing jurisdiction over Girard College?

By law and by provisions of the Girard will, the status of Girard College has been one of constant State and municipal responsibility. The launching of Girard College and its administration over the decades have brought into play governmental police powers and rights of eminent domain which could not possibly be exercised by private trustees. Members of the Legislature visit and inspect Girard College; its accounts must be open at all times to State inspection; the City of Philadelphia is required to submit reports on the College to the Legislature. The Treasurer of the City of Philadelphia handles the funds of the Girard Estate. The City Controller audits its accounts. The City is guardian of the persons and estates of the

students. In the latter capacity it holds $2,940,716.16 in property.*

The principal body involved here is not the Board of City Trusts as such, but the City of Philadelphia itself. The City is not merely a trustee. It acts for the inhabitants of Philadelphia. It is a beneficiary of the trust. The Act of June 30, 1869, creating the Board of City Trusts, provides: "The duties, rights and powers of the City of Philadelphia, concerning all property . . . dedicated to charitable uses or trusts, the charge or administration of which is now or shall hereafter become vested in . . . the city . . . *shall be discharged by said city* through . . . a board composed of fifteen persons, *including the mayor of said city* . . . who shall exercise . . . all the *duties and powers of said city* . . . concerning any such property appropriated to charitable uses . . . to the extent that the same have been or hereafter may be, by statute law or otherwise, vested in or delegated to the said city . . ."

In an interpretation of the Act of 1869, this Court said in the case of *Wilson v. Bd. City Trusts,* 324 Pa. 545, 555: "We cannot disregard the fact that the Mayor is the duly elected executive of one of the beneficiaries, the City, and that he represents not only himself as an individual but to a certain extent the citizens of Philadelphia who constitute the beneficiaries of all the trusts."

For 126 years Girard College has been administered as a public institution by public officials in their public capacities for the benefit of the public. If everything of a governmental character imbedded in the very sinews and fibers of Girard College were to be removed, it would be like withdrawing from a modern office

---

* 87th Annual Report, Board of Directors of City Trusts, p. 12.

building its structural framework. Take away the steel beams and columns of the Empire State Building and it would collapse into a mass of stone, bricks, mortar, glass, and debris. Take away the governmental backbone of Girard College and it will be a shapeless mass of indirection and purposelessness. The action of the Orphans' Court if unreversed, creates a condition which approaches the dignity of chaos. It opens up a Pandora's box of dilemmas, namely:

1. The Board of City Trusts is required to report to the City Council, the State Legislature, and the Courts of Common Pleas. Will the new board report to the City Council, Legislature, and Court of Common Pleas? If it does, then will its action not be State action? If it does not, how can the Orphans' Court decree do away with a requirement of the State Legislature?

2. Since the City remains as guardian of the person and estate of Girard College students, will that guardianship not bring the City within the application of the Fourteenth Amendment since the City is a branch of sovereign government?

3. While estoppel cannot operate against a State, is it not clear in honor and justice that when the Legislature of Pennsylvania, by the Act of 1832, enacted legislation which confirmed the State's acceptance of $300,000 bequeathed to it by Girard, it bound itself to a governmental management and supervision over the Girard Estate?

4. The Girard will left to the City the working out of details because the City Council is elected by the people. XXI, Sc. 9, 28a. But what opportunity will the people have to control the actions of private trustees?

5. The Girard funds were mingled with City funds. After more than a century of public management, is it

possible to determine the accretion due to public management, and will that accretion be paid back?

6. The Act of 1847 provided that students who reached 18 years of age were to be bound out by the City of Philadelphia to suitable occupations until they reached the age of 21. Will the City continue to do this?

7. Does the appointment of private trustees to manage Girard College make the college a private school? And will it now pay the taxes which are assessed against all private schools?

8. Etc.

9. Etc.

In order to make of Girard College a private institution it would be necessary to repeal at least five Acts of the Pennsylvania General Assembly;* it would be necessary to nullify 48 Ordinances of the Philadelphia City Council; it would be necessary to strip the College of all the public maintenance, supervision, and operation it has had for 126 years. It would be necessary to pay back all salaries paid public officials who have worked in the maintenance and operation of Girard College. The Orphans' Court can brandish no legal wand with which it can wipe out 126 years of continuous governmental control and shrink the oak tree of the Girard College of today into the acorn left by Stephen Girard. It must always be kept in mind that when the buildings of Girard College were finally constructed the fund of $2,000,000 left by Girard was practically exhausted. It was the good business judgment exercised by the Philadelphia City Council and the equally wise administration, under State direction, demonstrated by the Board of City Trusts which

---

* Each of these statutes is entitled "An Act Relative to Girard College," and none uses the phrase "white male orphans."

revived the fund and finally brought it to its present opulent state of $98,000,000.

In this Opinion I am first directing my attention to the fallacies in the Orphans' Court's decisions so that we can better and more easily understand what I regard to be the errors of this Court which has affirmed the Orphans' Court action. The Orphans' Court ordered what is legally and physically impossible. Girard College is intrinsically, architecturally, and economically* a creature of the State. The Orphans' Court has no jurisdiction to remove the Board of City Trusts. Under the Act of 1869, members of the Board may be removed only by vote of two-thirds of membership of the Court of Common Pleas (made up of 21 judges) of Philadelphia County.

The Orphans' Court says in its opinion: "Our course has been clearly charted." The charting to which it refers is the statement made by the Majority of this Court in its decision of November 12, 1956 (386 Pa. 548, 566): "Even if the Board of Directors of City Trusts *were* deemed to be engaged in 'State action' in the administration of the Girard Trust, petitioners would nevertheless not be entitled to the remedy they seek. If the city, because bound in its public or governmental actions by the inhibition imposed upon it by the Fourteenth Amendment, cannot carry out a provision of Girard's will in regard to the beneficiaries of the charity as prescribed by him, the law is clear that the remedy is, not to change that provision, which, as an individual, he had a perfect right to prescribe, but for the Orphans' Court, which has final jurisdiction

---

* The funds of the College and those of the City have been so intermingled that the City Council used income from the Girard Estate for municipal purposes other than the College, amounting to $571,958.42, in the years 1833 to 1848 inclusive. (Report of Hon. George Wharton Pepper, Auditor).

470

over the trust which he created, to appoint another trustee." (Emphasis in original).

This advice on the part of the Majority of this Court, I must say with all respect, was not a very wise one. Instead of following the channel marked by the Constitution, the advice indicated that a Northwest Passage might be found which would permit the Orphans' Court to reach a land where it had no right to be at all. Considering the public nature of Girard College there is no way for any administrator of that institution to avoid the Fourteenth Amendment.

On October 14, 1957, the Orphans' Court denied the petitions of Foust and Felder, of the City of Philadelphia, and of the Commonwealth of Pennsylvania, for reconsideration and vacation of its decree entered September 11, 1957 (the one dismissing the petitions of the applicants and removing the Board). In denying the petitions the Court said: "We are of one mind that the Supreme Court of Pennsylvania in its opinion filed in this case on November 12, 1956, (386 Pa. 548) squarely ruled upon all of these issues. We are bound by that decision. Our decree of September 11, 1957, is in conformity therewith."

Before such a statement, one can only stand in awe. What the Orphans' Court overlooks, and it is a strange oversight indeed, is that the decision of this Court from which the above quotation was taken, was reversed by the Supreme Court of the United States! And when a decision is reversed it is like the Andrea Doria at the bottom of the sea. It sinks in its entirety, not only in part. Rudder, bridge, hull, superstructure, compass, and quadrant all go. Thus, it is futile for the Orphans' Court to say that it is charting its course by compass and quadrant which are rusting in the submarine cemetery of law which is no more.

The action of the Orphans' Court in dismissing the Board of City Trusts and appointing thirteen so-called private trustees to operate the Girard Estate was more than an act of dubious legality. It was one of manifest illegality. By a stroke of the pen the Orphans' Court, if its action is not reversed, siphons $98,000,000 from the Treasury of the City of Philadelphia into the depositary of thirteen private individuals without compensation to the City, it reads into the will of Stephen Girard language which is not there, it passes over language which *is* there, it nullifies State statutes and City ordinances, it loses sight of a Constitutional amendment and misreads the plain wording of the mandate of the Supreme Court. However, it is interesting to observe that the Orphans' Court is not too certain, in spite of its assertion that its course was "clearly charted", that it is entirely confident that the course it selected actually conducts to the port it is seeking. In appointing thirteen private trustees, it chose six of them from the Board of City Trusts which it had already declared as disqualified and incompetent! It could not have believed that the Board was entirely disqualified and incompetent when it accepted almost 50% of the Board's membership to participate in the so-called private trusteeship. And it is well to observe, as pointed out by counsel for the City of Philadelphia, that: "These six constituted a majority of the living appointed members of the Board of Directors of City Trusts and included five of the eight members of the executive committee of the Board."

Does pinning a badge of private trustee on six heretofore declared public trustees remove the so-called incompetency of which the Orphans' Court speaks? It is interesting to note also that although, according to the Orphans' Court, the Board of City Trusts has been disbanded, it appears in this appellate litigation as an

appellee, thus being triumphant at its own supposed funeral.

It is enigmatic to me why this Court sent the case back to the Orphans' Court after the Supreme Court stated quite clearly what its decision was. This Court had decided that Foust and Felder should not be admitted to Girard College. The Supreme Court reversed that decision. What else could have been meant than that Foust and Felder were now to be admitted? The Majority Opinion makes a point of the language used by the Supreme Court in its order remanding the cause for "further proceedings not inconsistent with this opinion." What proceedings would there be other than admitting Foust and Felder to Girard College? There was nothing else pending. The admittance or rejection of the applicants was the only issue in the entire litigation. In support of its position of exclusion the Majority cites the case of *Sweatt v. Painter*, 339 U. S. 629. The Supreme Court there held that the "Fourteenth Amendment requires that petitioner be admitted to the University of Texas Law School." It also used the language embodied in the case at bar, namely, "The judgment is reversed and the cause is remanded for proceedings not inconsistent with this opinion." In the case at bar the applicants are minors. There are certain preliminaries which must be attended to before they may be admitted, even following a decision which would admit them on the ground that the Girard College is a public institution: there must be certain releases from relatives, the City must become the guardian, indenturing must be considered. "Further proceedings" obviously refers to the entire operation required to get Foust and Felder into Girard College, which certainly an appellate court would not spell out in detail.

I will now address myself more particularly to the Majority Opinion of this Court which affirms in toto the action of the Orphans' Court. At the outset I will say that several of the cases cited by the Majority support the position of the appellants rather than the appellees. For instance, in *Vidal et al. v. Girard's Executors,* 43 U. S. 126, the Supreme Court held that the *City of Philadelphia* was legally capable of executing the Girard trust. In *Girard v. Philadelphia,* 74 U. S. 1, the question again arose as to whether the City of Philadelphia, after the consolidation Act of 1854, could still function as trustee of the Girard estate. The Supreme Court held that it could and should so function.

The Majority cites *Holdship v. Patterson,* 7 Watts 547, 511, where Chief Justice Gibson said that a testator "has an individual right of property in the execution of the trust, and to deprive him of it would be a fraud on his generosity."

This is like quoting the Ten Commandments or reassuring the world that honesty is the best policy. The quotation asserts an immutable principle in the law, but its application in the *Holdship* case bears no logical relationship to what is involved in the case at bar, as will be observed from the syllabus of the case which succinctly states: "A benefactor may provide for a friend the means of subsistence for himself and family, without exposing his bounty to the debts or improvidence of the beneficiary. He has an individual right of property in the execution of the trust, of which he cannot be deprived by an execution against the trustee."

The Majority quotes the aphorism that "the trustee must be fitted to the trust and not the trust to the trustee." But, like many aphorisms, this also has its counterpart, and that counterpart is to be found in Section 397 of the Restatement, Trusts, namely, "If

the settlor manifests an intention that the intended charitable trust shall not arise or shall not continue . . . *unless the person named by him acts as trustee,* . . . the intended charitable trust fails unless the person named by him as trustee acts as trustee." [*]

Nothing could be clearer in Girard's will than that he intended the City of Philadelphia to be the trustee of his estate. In fact, as already indicated, the failure of the City to qualify would bring about a termination of the trust, and the passing over to the remainderman, the Commonwealth of Pennsylvania.

The Majority Opinion says that: "It is not possible to read Girard's will without being deeply impressed with the fact that it was *the college, as a private charity,* and *not the trusteeship of the city,* that was the primary object of the donor's testamentary scheme." (Italics in original)

This, of course, is like saying that one is more interested in the maintenance and operation of an office building than he is in the architect who is to build it. But he cannot have a building without the architect. Girard could not have a college without a trustee, and he specified that the trustee should be the City of Philadelphia. The City was the horse and the college the carriage. Without the horse the carriage could go nowhere.

The Majority admits that the trustee "was a necessary and unavoidable incident of the trust," and thus the testator availed himself of the services of the City. The Majority errs, however, when it says that in selecting the City, Girard "availed himself of the services

---

[*] If the administration of a laboratory for medical research is assigned to a physician, the substitution of a shoemaker might well wreck the institution and in such case it would be better that the trust fail than that the health and life of patients should be jeopardized.

of the only existing local corporate body capable of administering the trust in perpetuity."

The Majority of this Court* uttered this same inaccuracy in its Opinion in the *Girard Will Case*, 386 Pa. 548. Its repetition does not improve its standing in the realm of facts and realities. The fact of the matter is that continuous trustees were not rare in 1830. An advertisement in the New York Evening Post, August 6, 1822, proclaimed: "The public will readily perceive, that the advantages of this company to *protect property* for the benefit of *infants* or *others*, are far greater than those of individual executors or other trustees, who are always liable to casualties . . . By placing such property in the charge of this company, *who have continued succession*, there can be no danger whatever of any such casualties." ** (Italics in original)

When Girard wrote his will there were many corporate fiduciaries to handle trusts in perpetuity.*** Girard could also have provided for a self-perpetuating board of trustees if he had chosen to do so. The Dartmouth College charter provided for such a board.****

In stating that Girard chose the City of Philadelphia as trustee only because of its perpetual existence, the Majority speculates. But why speculate, when it is so evident why Girard made his particular selection? Girard wanted the City of Philadelphia to run the College because the City government was made up of representatives of the people. Girard knew that with

---

\* The membership is slightly changed since 1956.

\*\* I apologize for this item, taken from my Dissenting Opinion in the *Girard Will Case*, supra, but since the Majority repeated what it said in that case, on this subject, I had no recourse but to go to the same cupboard for the antidote.

\*\*\* Smith. Development of Trust Companies in the United States.

\*\*\*\* *Trustees of Dartmouth College v. Woodward*, 17 U. S. 518.

public operation, the College would be continually bathed in the spotlight of popular interest so that if any part of the citadel began to fall, because of incompetent management or corruption, the people could at the polls oust the bunglers or malefactors. Is this statement merely a deduction from the evidence in the case? Is it a conclusion drawn only from the history of the institution and the litigation which has gone with it? It is not. As respectable as such an argument would be, we do not depend alone upon history, logic, and reasonableness of view. We find Girard's specific intention expressed in the parchment of his last will and testament, namely, "In relation to the organization of the college and its appendages, I leave, necessarily many details to the Mayor, Aldermen and Citizens of Philadelphia and their successors; and I do so, with the more confidence, as, from the nature of my bequests and the benefit to result from them, I trust that my fellow citizens of Philadelphia, *will observe and evince special care and anxiety in selecting members for their City Councils and other agents."* (Art. XXI, Sec. 9)

If language of this specificity can be ignored, then fogs of confusion have enveloped the dictionary, and mists of ambiguity have made written communication of thought a snare and a delusion. Girard had but one underlying purpose in the disposition of his secular riches, and that was to benefit Philadelphia, that is, its people, and it certainly was not illogical thinking on his part to conclude that the best sentinels to stand guard over his bequeathed treasures were the representatives of those who would enjoy his largess.

The Majority even goes so far as to say, quoting from the Majority Opinion in the *Girard Will Case,* 386 Pa. 548, that the Girard College is not a school at all, but "a home where the fatherless boys eat, sleep,

study and live together." If we omit the word "father-less," how does that language differ from a description of any other male college? Is not the Lafayette College in Easton a home where boys eat, sleep, study and live together? Is that also not true of LaSalle College in Philadelphia, and Haverford College in Haverford, and Kings College in Wilkes-Barre? Girard College differs from these named colleges only in that the Girard students do not pay for tuition or maintenance, but, then, students do not pay for tuition or maintenance at the Naval Academy at Annapolis or the Military Academy at West Point, so that payment or nonpayment is not the criterion by which one determines whether an institution is a school or not.

The Majority Opinion says that: "Not a penny of State or city money has ever gone into it [Girard College]; no taxpayer has even been called upon to contribute to it." This argument was used in the *Girard Will Case* in 1956 by the then Majority of this Court. It was shown then to be without substantiation, but it is here being repeated and served again, but with no more flavor of plausibility than attended its original appearance on the platter of consideration. How can the Majority ignore that the State and the City have spent "not a penny" but countless tens and perhaps hundreds of thousands of dollars in making Girard College the institution it is today? Who can calculate the cost to the State of the printing, clerk hire, and secretarial service which went into the actions of the General Assembly in holding hearings, conducting investigations, drafting bills and enacting them into law? Who knows how much it cost the City of Philadelphia for the investigations and hearings attendant on the 48 ordinances passed by the Council of Philadelphia with regard to Girard College? How much of government money was spent in salaries for

478

State and City officials who gave of their official time in behalf of Girard College? Who can calculate how much it cost the City of Philadelphia and the General Assembly prior to 1869 to organize and actually operate the College? Who knows how much it cost for all the special visitations, for the audits, for the inspections and examinations conducted by the State of Pennsylvania and the City of Philadelphia in behalf of Girard College? Who knows what it cost the City to work out the investments which have increased the capital of Girard College from $2,000,000 to $98,000,000?*

The Majority says that "The Supreme Court did not say that there is any Constitutional or other legal barrier to the removal of the Board of City Trusts as trustee of Girard College in order that the orphanage can be administered in accordance with all of the testator's express directions including the qualifications for admission to the student body." The Supreme Court did not say that there could be a legal barrier to the removal of the Board of City Trusts because there was no necessity to say that. It decided only the issue before it. There certainly would have been no point in saying what this Court should do with regard to the Board of City Trusts, and certainly there would have been no point in referring to other persons who *might be* brought forward as potential trustees.

The Majority Opinion says that some of the legislative enactments in behalf of the Girard Estate were "purely administrative neither envisioned nor required by Girard's will," but if there can be a difference of opinion on this point, there should be none on the point that that legislation was the pulmotor to the Girard

_____

* I apologize again for repeating what I said in my Dissenting Opinion in *The Girard Will Case*, but that statement is as true today as it was in 1956, just as the Majority's statement is as unveritable today as it was in 1956.

estate which, had it not been for the direction, super-
vision, and expert business management given by legis-
latively created agencies, would have perished.

The Majority says that what Chief Justice LOWRIE
said in the case of *Philadelphia v. Girard's Heirs*, 45
Pa. 9, 25, is "peculiarly apposite here." Chief Justice
LOWRIE said in that case, as quoted by the Majority:
"In all gifts for charitable uses the law makes a very
clear distinction between those parts of the writing
conveying them, which declares the gift and its pur-
poses, and those which direct the mode of its adminis-
tration. And this distinction is quite inevitable, for
it is founded in the nature of things. We must ob-
serve this distinction in studying Mr. Girard's will,
otherwise we run the risk of inverting the natural or-
der of things by subordinating principles to form, the
purpose to its means, the actual and executed gift
for a known purpose to the prescribed or vaticinated
modes of administering it, that are intended for ad-
aptation to an unknown future, and of thus making
the chief purpose to the gift dependent on the very
often unwise directions prescribed for its future se-
curity and efficiency." This language may be, as
the Majority says, very apposite, but it is not very
clear. However, even if we were to gather from the
above quotation what Chief Justice LOWRIE had in
mind, we still do not see how what he said in 1863
can overrule what the Supreme Court of the United
States said in 1957.

The Majority says that "on the basis of the com-
pelling testamentary evidence. . . . Girard college is
a private charity capable of being lawfully administered
by private trustees." But as I stated before, how can
this Court or the Orphans' Court remove the City
as trustee when the *will* makes the City the trustee?
Of course, if the City were incapable, incompetent, or

unwilling to act as trustee, the Orphans' Court might then, under the rule that a trust will not fail for want of a trustee, appoint another trustee. But the City *is* capable, it *is* competent, it *is* willing to act as trustee. *Why then should it be removed when the removal runs counter to the wishes of the testator?* The provision in the Girard will that the college be limited to male white orphans is no stronger a provision than that the City should administer and care for the estate. The City of Philadelphia is the tabernacle of the Girard Estate, it is the ark of the covenant. The whole history of the legislation, maintenance, direction of Girard College and the litigation over the estate is permeated with Philadelphia. Girard College is as much a part of Philadelphia as Benjamin Franklin is indelibly a part of Philadelphia's history.

This Court has heretofore looked with a rather critical eye on the business of the removal of a trustee. In *Mathues's Estate,* 322 Pa. 358, Chief Justice KEPHART said: "The removal of a trustee is a drastic action, which should only be taken when the estate is actually endangered and intervention is necessary to save trust property."

In *Hartman's Estate,* 331 Pa. 422, 428, we said: "Where there is no loss to any of the parties in interest, courts are reluctant to remove fiduciaries appointed by will."

United States Circuit Court Judge RIDDICK said in the case of *Sternberg et al. v. St. Louis Union Trust Co.,* 163 F. 2nd 714, 719 (certiorari denied 68 S. Ct. 267): "A trustee appointed by will or deed may not be removed by the courts unless there appears a clear necessity for the removal to save the trust property."

Certainly there is no such necessity here.

It could never have been Girard's intention that, with an amendment to the United States Constitution,

all his plans should go awry. He could never have intended that when the United States Constitution went in one direction, his college should go in another. He was interested in founding a college for poor male children. He said "white male orphans" because the times and the law would not have permitted a collective school for free children and slave children. That was the whole sum and substance of his statement. The language of the whole will demonstrates this, Girard's whole life proves it.

Even if we were to assume arguendo that by substitution of trustees Girard College would become a private trust, the question would still remain: Is the substitution of trustees legally proper? The Majority says that the substitution of trustees is necessary in order to carry out Girard's primary intent. The Majority reasons itself into assuming that Girard's primary intent was to exclude Negroes from Girard College. But such an assumption is to attribute to Girard an intent which is not only contradictory to Girard's history of dedication to the furtherance and betterment of the welfare of the people but it is in opposition to the terms of his will. The Majority quotes from Girard's will—"only 'after providing for the College as hereinbefore directed as my *primary object,'*" the Majority emphasizing the words "primary object." Girard's primary object, true, was the establishment and maintenance of the college but his primary object was not to exclude Negro orphans from that college.

What would Girard say today if he could be asked whether he desired that a private trustee administer the College? Would he answer that he wishes Negroes to be excluded and thus lose all the benefits of a government-administered trust, or would he say that the City of Philadelphia, though it may no longer bar

482

Negroes because of the Fourteenth Amendment of the United States Constitution, should continue the administration with all the benefits attendant upon public administration? To strip from Girard College all the advantages of governmental administration such as tax exemptions, guaranteed investments, municipal supervision, State protection, publicly audited accounts, etc., only so that Negroes may be excluded from Girard College, is not to carry out Girard's primary purpose, but to defeat it! In view of the almost nonexistent rights of Negroes at the time Girard wrote his will, it is in accordance with history, with law, and established facts, to conclude that Girard's failure to include them as specified beneficiaries of his bounty was merely the result of his passive acceptance of conditions as they then existed. In any event, his failure to include Negroes does not evidence a primary intent that if they cannot be excluded by the City as trustee then Girard College must lose all the benefits which Girard expressly and specifically sought by providing for a governmental trustee.

The Majority devotes a page to the powers of the Orphans' Court of Philadelphia. No one questions its powers. What is questioned is the use of its powers in this case. The Majority says that the Fiduciaries Act of 1949 confers authority on the Orphans' Court to remove a trustee "when, for any other reason, the interests of the estate are likely to be jeopardized by his continuance in office." But where is the proof in this case that the interests of the Girard Estate are likely to be jeopardized by the continuance in office of the Board of City Trusts, which has been a guardian angel to the Girard Estate and a ministering angel to the Girard College?

The Majority quotes from *Stevens's Estate,* 200 Pa. 318, which speaks of the power of Chancery to remove

a trustee who lacks power to execute a trust. Again, we agree on the law, but again I must say that the Majority-cited law has no application to this case. It is not contended here at all that the Board of City Trusts lacks power in executing the trust.

The Majority says that when a charity is established, "such a slight impediment as a defect or want of power in the trustee to execute it does not stand in the way; the charity remains; the trustee is declared incapable of acting, and a competent trustee is appointed in his place." But there is no adjudication that the Board of City Trusts labors under any want of capacity or power to administer the Girard College in accordance with the nature and purpose of the Girard will. The Supreme Court of the United States held that under the present state of the law the Board of City Trusts may not exclude Foust and Felder from Girard College. As I have already indicated, it did not say that the trustee was incapable. It did not say that the trustee should be removed. It said that the machinery running Girard College was governmental. It did not suggest that the machinery should or even could be removed. It recognized a fact, namely, that Girard College is a public institution and that, therefore, this Court should initiate such proceedings as would be necessary to put its decision into effect. This could only mean that, once the necessary preliminaries were attended to, Foust and Felder were to be admitted to Girard College.

The Majority Opinion states in the way of a concession that ". . . a State agency, even when acting as the trustee of a private charity, can have *no part* in the enforcement of a racially discriminatory restriction . . ." (*Emphasis in original*). This is not the core of the case. As I have already discussed, the real questions are whether or not a private trustee may or should be

substituted for the Board of City Trusts, and if such substitution of trustees would make Girard College a private institution so as to take its administration out of the reach of the Fourteenth Amendment. I believe that negative answers to such questions are as inevitable as the daily sunrise.

Furthermore the Majority overlooks one of the most vital provisions of the will, and to which I have already adverted, namely: "But, if the said city hall shall knowingly and wilfully *violate any of the conditions hereinabove and hereinafter mentioned, then I give and bequeath the said remainder and accumulations to the Commonwealth of Pennsylvania,* ... excepting however, the rents, issues and profits of my real estate in the City and County of Philadelphia, which shall forever be reserved and applied to maintain the aforesaid College, in the manner specified in the last paragraph of the XXIst clause of this will." If the Orphans' Court felt that the City knowingly and wilfully violated Girard's will by pressing for admittance of Foust and Felder into Girard College, it could only declare a termination of the trust under the above-quoted terms of the will, since Girard had already provided for an alternative gift upon failure of the specifically named trustee to administer the estate. The Majority overlooks our statute of April 24, 1947, P.L. 100, §10, which reads: "Except as otherwise provided by the conveyor, if the charitable purpose for which an interest shall be conveyed shall be or become indefinite or impossible or impractical of fulfilment, or if it shall not have been carried out for want of a trustee or because of the failure of a trustee to designate such purpose, the court may, on application of the trustee or of any interested person or of the Attorney General of the Commonwealth, after proof of notice to the Attorney General of the Commonwealth

when he is not the petitioner, order an administration or distribution of the estate for a charitable purpose in a manner as nearly as possible to fulfill the intention of the conveyor, whether his charitable intent be general or specific."

Public welfare would not approve of such a termination. Girard would be appalled at such a termination. Girard regarded the founding and the continued existence of Girard College so essentially a crystallization of his intention that he conditioned his very trust on it. The administration of the trust by the City of Philadelphia should therefore continue as heretofore, minus the unconstitutional requirement.

A dissenting opinion that is earnestly written because the writer is disheartened at what he sees to be a manifest violation of legal principles may extend itself into an inordinate length since he wants to answer every paragraph, sentence, and phrase which contributes to the palpable injustice. However, there must be an end somewhere and I know of no better citation with which to terminate this Opinion than the case of *Kerr v. Enoch Pratt Free Library of Baltimore City,* 149 F. 2nd 212, cert. denied, 326 U. S. 721, where the facts are sufficiently similar to the ones in the case at bar as to make the reasoning therein unanswerable by the Majority in this case. Enoch Pratt of Baltimore gave to that City a library with certain conditions which were met by the Maryland Legislature and the Baltimore City Council. Funds were subsequently contributed to the institution by Andrew Carnegie. After the library had been operating some time, a Negro girl applied for admission as a trainee in the institution. The application was rejected and she appealed to the Courts, claiming that equal protection of the laws had been denied her. The United States Circuit Court of Appeals (Fourth District) upheld her

486

contention. Chief Judge SOPER, speaking for the Court, said:

"*The donor could have formed a private corporation* under the general permissive statutes of Maryland with power both to own the property and to manage the business of the Library independent of the State. *He chose instead to seek the aid of the state to found a public institution* to be owned and supported by the city but to be operated by a self-perpetuating board of trustees to safeguard it from political manipulation; and this was accomplished by special act of the legislature with the result that the powers and obligations of the city and trustees were not conferred by Mr. Pratt but by the state at the very inception of the enterprise . . . *It is our view that although Pratt furnished the inspiration and the funds initially, the authority of the state was invoked to create the institution* and to vest the power of ownership in one instrumentality and the power of management in another, with the injunction upon the former to see to it that the latter faithfully performed its trust. We know of no reason why the state cannot create separate agencies to carry on its work in this manner, and *when it does so, they become subject to the constitutional restraints upon the state itself.*"

I would admit William Ashe Foust and Robert Felder to Girard College.