DONAGHEY FOUNDATION *v.* LITTLE ROCK UNIVERSITY.

5-2105 332 S. W. 2d 497

Opinion delivered February 29, 1960.

*Barber, Henry, Thurman & McCaskill,* for Little Rock University; *Mehaffy, Smith & Williams,* By: *Robert V. Light,* for Little Rock School District, for appellant.

*Moore, Chowning, Mitchell, Hamilton & Burrow,* for appellee.

Carleton Harris, Chief Justice. This suit involves the construction of certain provisions of a deed in trust, executed by George W. Donaghey and his wife, on July 1, 1929, and marks the third time that an interpretation of the instrument has been before us. In *The Little Rock Junior College* v. *The Geo. W. Donaghey Foundation,* 224 Ark. 895, 277 S. W. 2d 79, we held that Little Rock Junior College, by expanding into a four year college, would not lose its identity as a beneficiary under the trust. The deed conveyed the property to certain individuals, as trustees, and provided:

"It is the object and purpose of this deed to convey the property herein described to said Trustees, their successors and assigns for the purpose of creating a fund or foundation to be used for the sole and exclusive benefit of the present Little Rock Junior College, an institution of learning in said city, at the present time operated under the management of the Board of School Directors of the Special School District of Little Rock, Arkansas, investing said Trustees with full discretion to select some other public school or schools in said city, operated by or under the management or supervision of the Board of School Directors of the said Special School District of Little Rock, and their successors in charge of the public schools in the said City of Little Rock, in the event the present Little Rock Junior College or its successors, should at any time cease to be operated by or under the supervision of the public school authorities in said city."

In 1957, the school directors of the Little Rock School District decided upon a plan to surrender their directorship of the college corporation to a private board, which would have the duty of serving the college only. In *Greene* v. *Thompson*,[1] 227 Ark. 1089, 305 S. W. 2d 136, we held that the plan, as proposed, was a violation of the deed in trust, but further added, "Should the School Directors of the Little Rock School District for any reason refuse to operate or supervise the Little Rock Junior College, then the power of equity to prevent the loss to the innocent beneficiary might be brought into play; but that situation is not here presented." The situation referred to by this language has now come into existence. In the latter part of July, 1959, Articles 4-7 of the Constitution and Charter of Little Rock University were amended to provide that the management and administration of the affairs of the corporation would be vested in the directors of the Little Rock School District "so long as said Directors are willing to serve, and so long as the Directors collectively do actually undertake the duties of supervising and operating the corporation." A Board of Trustees, composed

---

[1] The proposed plan is set out fully in that opinion.

of nine members, was created, whose duties are defined as follows: "So long as the Board of Directors supervises and operates the affairs of the corporation, the sole function and authority of the Board of Trustees shall be to advise and counsel with the Board of Directors in all matters pertinent to the operation of the corporation." Further: "In the event that the Board of Directors should ever refuse to operate or supervise the corporation, then upon the Board of Trustees being notified of such refusal, or upon the Board of Trustees making a finding of the fact of such refusal, the Board of Trustees shall, and are hereby fully empowered to, assume all of the duties and powers of the governing Board of the corporation heretofore held and exercised by the Board of Directors." The instrument further provides that the Board of Trustees, under those circumstances, shall continue to exercise the powers previously performed by the Board of Directors until such time as the Board of Directors notify the Trustees that they are willing to resume the operation and supervision. Finally, if the Board of Directors shall refuse to operate and supervise the corporation for an uninterrupted period of twelve consecutive months "then the Board of Trustees shall be thereafter the permanent governing board of the Little Rock University. * * *" The Board of Trustees of the University were advised by the six members of the Little Rock School Board that "due to the heavy demands on our time made by the problems of school management of the Little Rock School District, we find it necessary to notify you that we now refuse to operate or supervise the Little Rock University." On August 10, 1959, a like notice was sent to the Board of Trustees of the George W. Donaghey Foundation. The Foundation, on August 14, 1959, directed a letter to Richard C. Butler, Chairman of the Board of Trustees of Little Rock University, stating as follows:

"Being mindful of our obligations as Trustees and the duties and responsibilities imposed upon us by law, and in view of the decision of the Supreme Court of Arkansas in the case of *Greene* v. *Thompson,* we have

decided that the only safe course for us to follow is to decline to pay Little Rock University the income derived from the properties owned by the George W. Donaghey Foundation.''

Thereafter, suit was instituted by Little Rock University, and its Board of Trustees, seeking a declaratory judgment defining and clarifying powers, duties, obligations, and rights of respective parties. The Chancellor, *inter alia*, found:

''23. The Board of Directors of the Little Rock Special School District have acted in good faith in refusing to operate Little Rock University, but it would be highly inequitable and would violate the purpose and intent of the trustors to permit, as a result of their refusal, a diversion of Donaghey Trust funds from Little Rock University to a public school or schools operated, managed or supervised by said Board.

24. Little Rock University has ceased to be supervised and operated by the public school authorities of the Little Rock School District through the unilateral refusal of the members of the Board of said District to supervise or operate said University and the equitable powers of this Court should be exercised to prevent the loss and damage that will be sustained by Little Rock University, its faculty, and its student body through the deprivation of said income.

And in answer to the questions upon which the plaintiffs and the defendants seek a declaratory judgment, it is by the Court CONSIDERED, ORDERED, ADJUDGED AND DECREED THAT:

''(a) The George W. Donaghey Foundation and its Trustees may not withhold from Little Rock University the income from The George W. Donaghey Trust because of the refusal of the Board of Directors of Little Rock School District to supervise or operate Little Rock University.

(b) The Board of Directors of the Little Rock School District by refusing to supervise or operate Little Rock

University cannot force The George W. Donaghey Foundation and its Trustees to pay over the future income from said Trust to some public school or public schools of the City of Little Rock.

(c)   No public school or public schools in the City of Little Rock have a paramount right to the income from The George W. Donaghey Trust over the claim of Little Rock University thereto, because of the refusal of the Board of Directors of the Little Rock School District to supervise or operate said University, but on the contrary the Little Rock University has a paramount right to such income."

From such decree, the Foundation brings this appeal, and the Little Rock School District appeals from the finding of subsection (c).

Unquestionably, and this is admitted by all parties, Governor Donaghey's prime objective in creating the trust was to aid the cause of higher education in Greater Little Rock. This is well shown in his *Autobiography* and *Homespun Philosophy,* which are discussed in *Little Rock Junior College* v. *The Geo. W. Donaghey Foundation, supra.* A detailed discussion of his intent is therefore unnecessary, but we quote a few excerpts as a means of emphasizing the Governor's strong views. From *Homespun Philosophy*:

"I wonder how many of our citizens have made an estimate of what higher education has cost Greater Little Rock during the last fifty years. That is to say, how much actual cash has been sent out of the city to pay for it, leaving out the questions of the thousands of poor boys and girls who are unable to foot the expense of going away from home to college. Suppose that we say that Little Rock has, during the past fifty years, sent an average of 200 boys and girls a year away to college, which would seem to be a reasonable approximate. Then suppose we estimate that the cash outlay has been an average of a thousand dollars per annum. It is then but a simple calculation to find that the cost would

amount to the stupendous sum of 10 millions of dollars, ten millions of dollars wasted on the winds of negligence; for the neglect of not building an institution of higher education at home and thereby having ten millions of dollars now invested in Little Rock in one of the best universities in all of the South. 　*　*　*

Boys and girls educated at home not only are in the majority and stand together in molding the opinions of the State, but also are just about as well equipped for the affairs of life as those sent away to school. In other words, sending a child to Yale or Harvard or any other college does little more to educate him than sending him to a home institution. Textbooks and lectures by trained instructors can be studied and heard at one place as well as another.''

From the *Autobiography*:

''After frequent consultations with the school authorities and trustees I was convinced that no greater field for educational development exists anywhere than can be found right here in Little Rock where hundreds of boys and girls after graduating from high school are unable to advance further through a course in college.''

Originally, the Little Rock Junior College used the Little Rock Public School buildings at a time when those buildings were not being used for common school education. Teachers of the Little Rock public schools were used by the college. In other words, the operation of the college was a part-time operation, and it is understandable that the Governor foresaw no future difficulty in the college being operated by the School Directors of the Special School District of Little Rock, who were operating the school at the time of the conveyance. In the meantime, however, the situation has undergone drastic change. For instance, in 1929, there were twenty-seven schools in the Little Rock Public School System. By 1959, this number had increased to thirty-six. The faculty more than doubled, and the budget was nearly six times greater. In addition, divers p r o b l e m s have

arisen in recent years, not present in 1929, such problems requiring a large expenditure of time by the School Directors. The college itself has likewise steadily grown. From 421 students in 1929, the enrollment has increased to 1,485. Compared to a 1929-30 budget of $36,874.33, we find that the present budget calls for $543,276, of which the University is dependent upon the Foundation for $90,000. It is apparent that Governor Donaghey could not, in 1929, have foreseen the conditions that make it almost impossible for the Little Rock School Board to operate the college. It is likewise apparent from his writings, that the growth of Little Rock University would have filled his heart and mind with pride and happiness—the happiness that comes to one when a dream is fulfilled. It is inconceivable that Governor Donaghey would have abandoned his fond expectations for a fine institution of higher learning in Little Rock simply because the school, without any fault of its personnel, could no longer be operated under public authority. Will equity permit an innocent beneficiary to suffer under such circumstances? The answer has been given many times. In *1 Restatement of Trusts* 2d, § 167, this power is discussed under ''Change of Circumstances'', at page 351:

''(1) The court will direct or permit the trustee to deviate from a term of the trust if owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust; and in such case, if necessary to carry out the purposes of the trust, the court may direct or permit the trustee to do acts which are not authorized or are forbidden by the terms of the trust.''

In 89 *C. J. S. Trust,* § 87e (2), it is stated at page 895:

''In an emergency, or in circumstances not anticipated by the settlor, an equity court may, in order to preserve the trust or effectuate its purpose, authorize the trustee to deviate from its terms. * * * A court of equity will put itself in the trustor's place and en-

deavor to authorize the trustee to deviate from the terms of the trust in a manner which the court believes the trustor would himself have authorized if he could have anticipated a necessity for subsequent alteration of his plan.''

One of the best known cases dealing with the power of a court to alter administrative provisions in order to carry out the intent and purposes of the trustor in making the gift is *Girard College Trusteeship,*[2] 391 Pa. State Reports 434, 138 A. 2d 844. There, Stephen Girard of Philadelphia, in his will, provided for the devise and bequest of his entire residuary estate to ''the Mayor, Aldermen, and Citizens of Philadelphia'',[3] their successors and assigns, in trust, to erect a college for the benefit of certain orphan children. Certain conditions were then set forth, after which the instrument provided that if the city should knowingly and wilfully violate any of the conditions in the will, the remainder of the residue (except the income from certain real estate in Philadelphia) was to be given to the Commonwealth of Pennsylvania for purposes of internal navigation, and further, that if the Commonwealth failed to apply the bequest to the purposes mentioned, the said remainder was given to the United States of America for purposes of internal navigation. Following the decision of the United States Supreme Court, mentioned in footnote 2, the Orphans' Court of Philadelphia County entered decrees removing the Board of Directors of City Trusts as trustee of Girard College, and substituted for that purpose thirteen private citizens, since the original board was unable to comply with the directives contained in the trust provisions. This action

---

[2] This is the second case involving the same subject matter. In the first case, found in 386 Pa. 548, the judgment of the Supreme Court of Pennsylvania was reversed by the Supreme Court of the United States. See *Commonwealth of Pa.* v. *City of Phila.,* 353 U.S. 230.

[3] This was the corporate name of the city under Act of March 11, 1789. Subsequently, the title was changed to "The City of Philadelphia". Actually, the college had been administered by the Board of Directors of City Trusts of Philadelphia, statutorily created by an act of June 30, 1869, which empowered the Board to accept and execute charitable trusts bequeathed to the city of Philadelphia as trustee.

was upheld by the Pennsylvania Supreme Court, which, *inter alia,* stated:

"In all gifts for charitable uses the law makes a very clear distinction between those parts of the writing conveying them, which declares the gift and its purposes, and those which direct the mode of its administration. And this distinction is quite inevitable, for it is founded in the nature of things. We must observe this distinction in studying Mr. Girard's will, otherwise we run the risk of inverting the natural order of things by subordinating principles to form, the purpose to its means, the actual and executed gift for a known purpose to the prescribed or vaticinated modes of administering it, that are intended for adaptation to an unknown future, and of thus making the chief purpose of the gift dependent on the very often unwise directions prescribed for its future security and efficiency."

We agree with this logic; otherwise, the "tail would be wagging the dog."

A study of that Court's opinion, together with a vigorous dissent by Mr. Justice MUSMANNO, reveals that the Pennsylvania legislature, long years ago, enacted legislation authorizing the city of Philadelphia to provide for "the election or appointment of such officers and agents as they deem essential to the due execution of the duties and trusts enjoined and created by the will of Stephen Girard," and further passed an act constituting Philadelphia the guardian of the person and property of every child admitted to Girard College. Forty-eight ordinances dealing with the college were passed by the City Council, and other legislation was enacted relative to the institution. Legislators visited and inspected the college; its accounts were open at all times to state inspection; the city of Philadelphia was required to submit reports on the college to the legislature; the treasurer of the city of Philadelphia handled the funds of the Girard estate; and the city controller audited the accounts. From the Court's action in affirming the decree, an appeal was taken to the Supreme Court of the

United States, which, on June 30, 1958, issued the following *Per Curiam*: "The motion to dismiss is granted and the appeal is dismissed. Treating the papers whereupon the appeal was taken as a petition for writ of certiorari, certiorari is denied." 357 U. S. 570, 2 L. ed. 2d 1546, 78 S. Ct. 1383.

At once, a marked difference in the *Girard* case, and the case presently before us is noted. There, public officials of the City of Philadelphia were named as the actual trustees, and were charged with the duty of administering the trust. Here, only private citizens, or at least citizens acting in their private capacities, were named as trustees. Also, the *Girard* trustees were removed by court order, while in the case before us, the Board charged with operating the college has refused to perform that function. These facts, of course, make the position of Little Rock University even stronger in this litigation. Moreover, no legislative supervision has been afforded; nor has any public money been expended. Little Rock University is entirely a private institution, as that term is generally used.

In the *Girard* case, contingent beneficiaries existed, but the courts did not permit the primary beneficiary to suffer, even though this was true. We are likewise of the view that Governor Donaghey's primary beneficiary should not suffer loss, even though contingent beneficiaries are provided.

Governor Donaghey's writings made clear that he and his wife were interested in aiding the establishment of an institution of higher learning in this locality, designed primarily to accommodate prospective students from this area. Little Rock University presently qualifies to receive this aid. The trustees of the Donaghey Foundation, through counsel, have already stated, in open Court, their desire and intention to continue the payments to the University if such be approved by this Court. This course being adopted, the college is entitled to continue to receive the income until such time as there is a change of circumstances which would require the

trustees to withdraw financial support from the University, *i.e.*, the trustees cannot capriciously or abritrarily withdraw this aid. We do not define the term, ''change of circumstances'', for many unforeseen situations might arise, *viz.*, a permanent closing of the college—the relocation of the college some distance away, or other change of similar moment. In such event, the trustees, in their discretion, could properly designate another beneficiary, eligible under the terms of the instrument. Since there is a possibility that such contingencies could arise, we modify the holding of the Chancery Court, wherein the court held that ''Little Rock University has a paramount right to such income.'' With such modification, subsection (c) of the decree reads:

''No public school or public schools in the City of Little Rock have a paramount right to the income from The George Donaghey Trust over the claim of Little Rock University thereto, because of the refusal of the Board of Directors of the Little Rock School District to supervise or operate said University.''

So modified, the decree is affirmed.